ISAAC J. BEAR ET AL. V. AARON HEASLEY ET AL.

*Religious societies—Constitutional amendments—Change of creed—
Right to possession of church property.* .

98 279
102 372

98 279
f113 376
f113 377

98 279
117 114.

98 279
f150 ⁴217

1. The regularity of the adoption of the constitution of a religious society, which has been acquiesced in, recognized, and accepted as its fundamental law for nearly 50 years, is not open to question.

2. The relation between the members of a voluntary religious society is one of contract, and the confession of faith and the constitution adopted by the society constitute the terms of such contract, which is binding upon all.

3. An amendment of the constitution of such a society, to be valid, must be adopted in accordance with the provisions of the constitution in force at the time of such adoption respecting such amendment.

4. Church judicatories cannot usurp legislative powers; and, while the civil courts will not review their decisions upon the merits, the proposition that their judgments as to their own powers or jurisdiction, or the lawfulness of their methods, are conclusive, is not sustained by reason or weight of authority.

5. Where the constitution of a religious society vests the power to make or repeal any rule of discipline in a general conference, subject to the restriction that no rule or ordinance shall at any time be passed to change or do away with the existing confession of faith, and prohibits any alteration of the constitution unless by request of two-thirds of the whole society, and the conference, without such request, formulates substantial changes in and additions to the confession of faith and amendments of the constitution, and on a vote of two-thirds of the members of the society voting, but not of the society, declares said altered confession of faith and amended constitution adopted, such action is invalid, and the title to and right to the possession of the real estate of the society is in that part thereof which is acting in harmony with the original constitution and laws, regardless of its strength numerically.

Appeal from Allegan. (Loveridge, J., presiding.) Argued June 14 and 15, 1893. Decided December 22, 1893.

Bill filed to determine the right to the possession of church property, and to enjoin the defendants from excluding complainants from the use and enjoyment thereof. Defendants appeal. Decree reversed, and bill dismissed. The facts are stated in the opinions.

*W. B. Williams & Son (John A. McMahon* and *L. E. Knappen,* of counsel), for complainants.

*H. H. Pope.* and *C. R. Wilkes (Taggart, Wolcott & Ganson* and *William Lawrence,* of counsel), for defendants.

GRANT, J. Complainants claim in their bill that they constitute the legal board of trustees of the Church of the United Brethren in Christ at Salem; that the defendants, who are in possession of the house of worship and other church property, claim to be the legal trustees, and exclude them from the possession and use thereof; and they pray that defendants may be enjoined from interfering with them in the possession, use, and enjoyment thereof.

Although the church originated nearly a century and a half ago, it appears to have had no written confession of faith until 1815, when its general conference, held in Pennsylvania, adopted one. This confession of faith was recognized and adhered to as containing the fundamental doctrine of the church until 1889, when the defendants claim that it was changed.

The church had no written constitution until 1837, when a general conference held at Germantown, Ohio, formulated and unanimously adopted one. The members of that conference doubted their authority to adopt a constitution, and therefore the conference issued a circular to give notice to the church throughout the Union that "we intend to present a memorial to the next general conference, praying them to ratify the constitution now adopted." The con-

ference met quadrennially, and, when it assembled in 1841, it appears to have ignored entirely the constitution of 1837, and the validity of its adoption, and adopted another, which is one of the subjects of this controversy. The regularity of the adoption of this constitution was early questioned by some members of the church. It is too late now, however, to question it, since it was recognized and treated as the organic law of the church for nearly 50 years.

This constitution recognized the confession of faith as it then stood, and provided that "no rule or ordinance shall at any time be passed to change or do away" with it. One section provided, "There shall be no connection with secret combinations." Article 4 provided, "There shall be no alteration of the foregoing constitution, unless by request of two-thirds of the whole society." It provided for a general conference, to consist of the bishops, and of elders elected by the members of every conference district throughout the society. All ecclesiastical power to make or repeal any rule of discipline was vested in this conference. The discipline, which was early adopted, made it the duty of the general conference "to examine the administration of each annual conference, whether it has strictly observed the rules and preserved the moral and doctrinal principles of the discipline in all its transactions." At the general conference of 1885, the following resolution was adopted:

"*Resolved,* by the general conference of the United Brethren in Christ here assembled, that the general conference of our church is, and is hereby declared to be, the highest judicial authority of our church."

It is conclusively established by this record that the general conference is the highest judicatory of the church, and is intrusted with the general supervision of its affairs, both temporal and spiritual. In all matters, therefore, in which it has jurisdiction, its judgments are binding upon

the church, its clergy, and its members, and will not be reviewed by the civil courts.

Disputes arose in the church as to certain articles of the constitution, and as to the meaning of certain portions of the confession of faith, and as early as 1869 the division of sentiment was clearly defined, and those who favored a change in the constitution became known as "Liberals," and those opposed as "Radicals." In 1885 the bishops, in their address to the general conference, called attention to these matters, and a committee was appointed to consider them, and make a report thereof to the conference. This committee made the following report:

" *To the General Conference:* Your committee to which was referred the confession of faith, constitution, and section 3 of chapter 10 of the discipline, beg leave to report that we have given these subjects much and most prayerful attention, and now submit the result of our deliberations:

"*First.* We find that the present constitution of the church was never submitted to the suffrage of the members and ministry of the church for ratification, either by popular vote or by conventional approval, though it purports to be the constitution of the 'members' of the denomination.

"*Second.* We find, by reference to the records, that throughout most of its history it has been the subject of question and differences of opinion as to its legality and binding force as an organic law.

"*Third.* We find, also, that the clause found in article 2, section 4, which says, 'No rule or ordinance shall at any time be passed to change or do away with the confession of faith, as it now stands,' and article 4, which says, 'There shall be no alteration of the foregoing constitution, unless by request of two-thirds of the whole society,' are, in their language and apparent meaning, so far-reaching as to render them extraordinary and impracticable as articles of constitutional law.

"*Fourth.* From the facts and reasons thus indicated, we conclude that the constitution has acquired its force only by the partial and silent assent of the church, and that the general conference has a right to institute measures

looking to the amendment, modification, or change of the constitution at any time when it is believed that a majority of our people favor a modification thereof.

"*Fifth.* It is the sense and belief of your committee that the constitution, as it stands, is not in harmony with the present wishes of our people, as has been indicated in discussions, petitions, and elections during the past year.

"*Sixth.* For these reasons, and for the purpose of finally settling all questions of dispute and matters of disturbance to the peace and harmony of the church, so far as the confession of faith and the constitution are concerned, your committee would recommend the adoption of the following paper, namely:

" ' CHURCH COMMISSION.

" '*Whereas,* our confession of faith is silent or ambiguous upon some of the cardinal doctrines of the Bible, as held and believed by our church; and—

" '*Whereas,* it is desirable and needful to so amend and improve our present constitution as to adapt its provisions more fully to the wants and conditions of the church in this and future time: Therefore—

" '*Resolved,* by the delegates of the annual conference of the Church of the United Brethren in Christ, in general conference assembled, that a church commission, composed of twenty-seven persons, and consisting of the bishops of the church, and ministers and laymen appointed and elected by this body, an equal number from each bishop's district,—provided, that the Pacific district shall have two members besides its bishop,—be and is hereby authorized and established. The duties and powers of this commission shall be to consider our present confession of faith and constitution, and prepare such a form of belief, and such amended fundamental rules for the government of this church in the future, as will, in their judgment, be best adapted to secure its growth and efficiency in the work of evangelizing the world.

" '*Provided*—

" '1. That this commission shall preserve unchanged, in substance, the present confession of faith, so far as it is clear.

" '2. That it shall also retain the present itinerant plan.

" '3. It shall keep sacred the general usages and distinctive principles of the church on all great moral reforms, as sustained by the word of God, in so far as the province of their work may touch them.

" '*Provided,* further, That in the final adoption, as a whole, of a confession of faith and constitution, for submission to the church by the commission, a majority vote of all the members composing the commission shall be necessary.

" ' *Resolved*, That this commission shall meet at such time and place as the board of bishops may appoint, and is expected to complete its work by January 1, 1886. The commission shall also adopt, and cause to be executed, a plan by which the proposed confession of faith and constitution may receive the largest possible attention and expression of approval or disapproval by our people, including all necessary regulations for taking, counting, and reporting the vote.

" ' *Resolved*, That when, according to the foregoing provisions, the result of the vote of the church shows that two-thirds of all the votes cast have been given in approval of the proposed confession of faith and constitution, it shall be the duty of the bishops to publish and proclaim said result through the official organs of the church, whereupon the confession of faith and constitution thus ratified and adopted shall become the fundamental belief and organic law of this church.

" ' *Provided*, further, That the adoption of the constitution as aforesaid shall in no wise affect any legislation of this general conference for the coming quadrennium.' "

The committee presented a supplementary report, recommending the adoption of the following law in reference to secret combinations:

"A secret combination, in the sense of the constitution, is a secret league or confederation of persons holding principles and laws at variance with the word of God, and infringing upon the natural, social, political, or religious rights of those outside its pale. Any member or minister of our church found in connection with such combination shall be dealt with as in other cases of disobedience to the order and discipline of the church in case of members, as found on page 23 of discipline, in answer to the third question of section 3, chapter 4, and, in case of ministers, as found in chapter 6, section 13, page 65."

These reports were signed by 11 of the committee. Two members filed the following minority report:

"1. The constitution we now have in the discipline, and have had for forty-four years, is the constitution of the Church of the United Brethren in Christ, and every member legally received into the church, for years, has consented to be governed by the same. It was declared legal, also, by the general conference of 1849, and to it our legislation has conformed, and under its directions our officers have

been elected, and the general conference formed according to its provisions.

" 2. This constitution makes no provision for the general conference to alter or change it without first securing the consent of the members of the church by a two-thirds vote, as required in article 4 of the constitution, and to take any other method would not be legal.

" 3. It is our view that this question as to the constitution should be determined before we revise section 3 of chapter 10."

After a long discussion, the conference adopted the majority report by a vote of 78 to 42, and the supplementary report by a vote of 76 to 38. The commission was duly appointed, entered upon its work, and prepared what is termed a " Revised Confession of Faith," and the " Amended Constitution." It also prepared a plan of submission, by which the confession of faith, as a whole, was to be submitted to a vote of the church.

Ballots were to be written or printed in the following form: " Confession of Faith,"—after which was to be written or printed " Yes " or " No," according to the wish of the voter. The amended constitution was to be submitted as a whole to the vote of the church, with the exceptions that the clauses as to lay delegation and secret combinations were to be submitted separately. The vote was to be taken during the month of November, 1888. The publishing agent at Dayton, Ohio, was to furnish each presiding elder, three months before the time of voting, the necessary number of tickets and return blanks. The pastor, leaders, and stewards of each society were to constitute the local board of tellers. Any member incapacitated, by age or affliction, to attend the meetings, or any minister absent on his charge, might send his ballot with his name signed on the back thereof. The local boards of tellers were to make returns to the general board of tellers, which was provided by the commission. The election was

fixed to take place at the same time as the election of delegates to the quadrennial conference of 1889.

The commission, upon the completion of its work, in 1885, caused the proposed revised confession of faith and the amended constitution to be published in their church papers. Many thousands of copies were published in pamphlet form, and circulated among its members. The matter was thoroughly discussed both in the press and the pulpit of the church. Every means possible appears to have been taken to enlighten the members upon the issues involved. There was evidently no lack of knowledge or information on the part of the clergy and the members of the church as to when and how the vote was to be taken. There is no doubt but that the matter entered largely into the election of delegates to the general conference, and that they were elected, to a considerable extent at least, in accordance with the views they entertained upon this subject. Charges of unfairness in the preparation and distribution of the ballots were made against those who were charged with the performance of this duty. These charges relate mainly to the form of the ballot, and to the failure to send ballots to all the presiding elders. While the conduct of the parties so charged is subject to some just criticism, still, we do not think it resulted in depriving any member of his vote. The Michigan conference resolved not to vote upon any proposition submitted. Four conventions were held in different parts of the country by those who were opposed to the adoption of the articles, and they recommended their members not to vote, but to present their views to the general conference by petition. The interest in the subject was general, and the bishops and clergy evidently spared no effort to impress their views upon the members of their several charges. But, in the view I take, it is unnecessary now to determine the ques-

tions arising upon the manner in which the vote was taken. The total vote on the confession of faith was 54,380, the majority for it being 47,760. The total vote upon the amended constitution was 54,344, the majority for it being 47,026. The total vote on lay delegation was 54,459, the majority for it being 43,191. The total vote on secret combinations was 54,292, the majority for it being 39,696. The total vote for delegates to this conference was between 58,000 and 59,000.

The commission made due report of its action and of the vote cast to the general conference, which assembled May 9, and continued in session till May 22, 1889. The conference referred this report to a special committee of seven to examine it, and determine whether the commission had acted in compliance with the instruction of the general conference, and whether the vote had been orderly and regular, and to recommend such action as it might deem proper to be taken in the premises. Two reports were made by this committee,—a majority report, signed by five, and a minority report, signed by two. The minority report objected to the regularity of the proceedings, and recommended the conference to submit such amendments of the constitution to the vote of the people as it might deem wise and prudent, which should be regarded as a petition for such proposed changes. Protests against the adoption of the proposed changes were presented, signed by 16,282. On May 13, 1889, the bishops issued a proclamation announcing that the revised confession of faith and the amended constitution had been adopted by the required two-thirds vote of the church. After a long and able discussion by the members of the conference, the new articles were declared adopted by the emphatic vote of 110 to 20.

Upon the issuance of the above proclamation by the bishops, 15 of the 20 withdrew from the conference, met

at another place, and solemnly proclaimed that they were the Church of the United Brethren in Christ, and that the majority of the general conference had formed a new church. They therefore proceeded to elect bishops and to do business as though they were the regular, authorized, and legally constituted general conference of the church. The regular conference, after declaring the amended constitution adopted, proceeded with its business as the regularly organized body of the church. Complainants derive their authority from the latter body; the defendants, from the former. The defendants took possession of the property, and refused to the complainants any use thereof. The property in question was deeded to, and belongs to, the United Brethren in Christ; and the sole question is, which of these contending parties represents the church, as trustees of the property in controversy?

I have stated above the history of this unfortunate controversy, which has found its way from the ecclesiastical into the civil courts of several of the states, so far as I deem it necessary to an understanding and determination of the present suit.

1. It is contended on the part of the defendants that the revised confession of faith is a radical change from the old, and that by its adoption the faith and doctrine upon which the church was founded have been subverted and overthrown; that the members who constituted the majority of the conference became heretics to the true faith,— placed themselves outside the pale of the church; that the conference no longer represented the church; and that the small minority which withdrew, and those who follow them, have kept the true faith, and are in fact the church. . If this contention be sustained, it follows that the minority are entitled to the possession of the church property.

It is the settled law of this country that the judgments of the judicial tribunals of church organizations upon

matters of faith, discipline, and the general polity and
tenets of the church are binding upon the civil courts.
*Connitt v. Church*, 54 N. Y. 551; *Earle v. Wood*, 8 Cush.
456; *Miller v. Gable*, 2 Denio, 548; *Watson v. Jones*, 13
Wall. 679, 727; *Lamb v. Cain*, 129 Ind. 486; *Schweiker v.
Husser*, 146 Ill. 399.   The rule and the reason therefor are
ably stated in *Watson v. Jones*, as follows:

   "In this class of cases, we think the rule of action
which should govern the civil courts, founded in a broad
and sound view of the relations of church and state under
our system of laws, and supported by a preponderating
weight of judicial authority, is that whenever the questions
of discipline, or of faith, or ecclesiastical rule, custom, or
law, have been decided by the highest of these church
judicatories to which the matter has been carried, the legal
tribunals must accept such decisions as final, and as bind-
ing on them, in their application to the case before them.
   *    *    *    *    *    *    *    *    *    *    *

   "In this country the full and free right to entertain
any religious belief, to practice any religious principle, and
to teach any religious doctrine which does not violate the
laws of morality and property, and which does not infringe
personal rights, is conceded to all.   The law knows no
heresy, and is committed to the support of no dogma, the
establishment of no sect.   The right to organize voluntary
religious associations to assist in the expression and dis-
semination of any religious doctrine, and to create tribunals
for the decision of controverted questions of faith within
the association, and for the ecclesiastical government of all
the individual members, congregations, and officers within
the general association, is unquestioned.   All who unite
themselves to such a body do so with an implied consent
to this government, and are bound to submit to it.   But
it would be a vain consent, and would lead to the total
subversion of such religious bodies, if any one aggrieved
by one of their decisions could appeal to the secular courts,
and have them reversed.   It is of the essence of these
religious unions, and of their right to establish tribunals
for the decision of questions arising among themselves, that
those decisions should be binding in all cases of ecclesiastical
cognizance, subject only to such appeals as the organism
itself provides for.

"Nor do we see that justice would be likely to be promoted by submitting those decisions to review in the ordinary judicial tribunals.   Each of these large and influential bodies (to mention no others, let reference be had to the Protestant Episcopal, the Methodist Episcopal, and the Presbyterian churches) has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collections of precedents, in their usage and customs, which, as to each, constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with. It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own.   It would therefore be an appeal from the more learned tribunal in the law, which should decide the case, to one which is less so." .

There can be no exception to this rule, except in a case where, even in the minds of laymen, no 'doubt can exist, and it is clear, beyond controversy, that the fundamental principles of the church have been destroyed by the one party, and been adhered to by the other.   In the present case the intention on the part of the so-called "Liberals" to adhere to the substance of the old confession of faith is manifest.   The conference of 1885 resolved to make no departure in substance therefrom, and so instructed the commission in its work of revision.   In the discussion which took place in the conference of 1889, the radicals do not appear to have attacked the confession of faith, as reported from the commission.   One member of the conference, towards the close of the debate, said:

"Is it not marvelous that not a brother on the other side of the house, from Brother Barnaby to Bishop Wright, has said a word against the work of the commission itself?   They have not said anything against the confession of faith, as it has been formulated and presented to us. They do not say that it is any different from the old one, or that there is any heresy in it.    *.    *    *    It corresponds with the old.    It expresses it better, and in a

more beautiful and orderly form, than the old one did. It also brings in some doctrines that were scattered through the discipline in various forms, and they are put in a new arrangement."

The truth of this statement does not appear to have been questioned by any member of the opposition. Leading bishops of the church, and theologians of other churches, have testified that in their judgment there is no difference in meaning and substance between the two. It is, moreover, established by the evidence that the same doctrines which were taught before have been taught in the churches controlled by the liberals since the conference of 1889. That conference, composed of the bishops and learned divines of the church, and being its highest judicial tribunal, and having the clear jurisdiction over the subject, has decided the question. What sense or reason is there in holding that the decisions of this ecclesiastical court upon a pure question of religious faith and doctrine may be reviewed and overruled by a court composed exclusively of laymen? The churches of this country have wisely left the decision of these questions to their own tribunals, and the civil courts have wisely accepted them as binding and final.

But it is insisted that property rights are involved, and that, therefore, the civil court must examine and determine the question. I cannot assent to this contention. In these controversies, personal or property rights are usually involved. The one is as dear as the other. When a minister is charged with preaching heresy, both his personal and property rights are involved. In all such cases, when the issue depends upon whether the faith of the church has been subverted, the decision of the church judicatory which has jurisdiction of the question is conclusive. Civil courts will not interfere in these controversies, even in cases where rights of property are involved, except in the case

of a clear and palpable violation of trust. No such viola-
tion has been established in this case on account of the
adoption of the revised confession of faith, the validity of
which has been established by the highest judicial authority
of the church.

2. It is next contended by the defendants that the pro-
ceedings for amending the constitution were irregular and
void, mainly for the reason that no request was made there-
for by "two-thirds of the whole society," as provided by
the constitution; and that, even if the preliminary meas-
ures to secure the vote were legal, still the constitution
failed of adoption, because two-thirds of the members of
the church did not vote for it. I do not think the ques-
tion here involved depends upon the determination of the
validity of the adoption of the amended constitution. If
it be admitted that the amended constitution was not
adopted, it does not follow that the minority of less than
one-eighth, which seceded from the conference, and their
followers, constitute the true church, and are entitled to
the possession of its temporalities, and the entire church
property, aggregating in value about five millions of dollars.
Clear, indeed, must be the case which will result in set-
ting aside the cardinal principle which lies at the founda-
tion of free government, in church as well as in state, viz.,
the right of the majority to rule. If ecclesiastical bodies,
in their legislative capacity, commit unconstitutional acts,
these acts may be set aside by the courts, and they be
compelled to observe and act under the constitution legally
adopted for their guidance. This is the rule in municipal
government, and is equally applicable to church govern-
ment. There is no more reason in holding that church
officers, when acting illegally, do thereby cease to represent
their church, and to constitute its legislative, executive, or
judicial body, than there would be in holding that munici-
pal officers, when so acting, thereby cease to be such

officers, or to constitute the legal authority of the municipality. Both may be impeached or deposed, but, until they are, they are *de facto* and *de jure* officers of the organization which elected them. Courts may, by their decrees, keep such officers within constitutional limits, but will not declare them outside the pale of the church, and turn the organization over to the minority, because the majority have committed an error in determining that a law has been properly enacted, or its constitution regularly adopted.

The conference of 1885, which proposed the amendments, was a constitutional body, regularly elected. So, also, was the conference of 1889, which ratified them. As already shown, there has been no departure from the religious principles upon which the church was founded, and its faith is still the same. It is important, I think, in this connection, to note wherein the old and the amended constitution agree and wherein they differ. Both declare that the general conference shall enact no rule or ordinance which shall change or destroy the confession of faith, or the itinerant plan, or which shall deprive local preachers of votes in the annual conferences. Both hold the right of appeal inviolate, declare against human slavery, provide for the same conferences, the same methods of electing bishops; and the amended constitution makes no change whatever in the officers of the church, in their rights and duties, or in the general form of government. The clauses in regard to the ownership of church property are identical in language. The main changes are in the provision for lay delegation in the general conference, and in the amendment in regard to "secret combinations." The amended article on this subject reads as follows:

"We declare that all secret combinations which infringe upon the rights of those outside their organization, and whose principles and practices are injurious to the Christian

character of their members, are contrary to the Word of God, and that Christians ought to have no connection with them. The general conference shall have power to enact such rules of discipline with respect to such combinations as in its judgment it may deem proper."

Evidently this article on secret combinations is the chief one which has caused the dissensions and divisions in this church. We are not concerned, however, in interpreting the meaning of this article in the old constitution, nor in determining wherein, if at all, it differs from the one in the amended constitution. It is not now essential. Both the conference of 1885 and that of 1889 acted in entire good faith, and in the belief that their proceedings were constitutional. They have been sustained by the courts of last resort of several of the states, and by the learned circuit judge who, in the present •case, wrote an able an exhaustive opinion. *Schlichter v. Keiter*, 27 Atl. Rep. 45; *Lamb v. Cain*, 129 Ind. 486.

Grant that the action of the conference was illegal in declaring the amendments adopted, it is, indeed, a startling proposition that by this act the conference destroyed its identity, ceased to represent the church, seceded from it, and thereby become a new and different church. The proposition finds no principle in law, equity, or good sense upon which to stand. The 15 who left the regularly-constituted conference became the seceders, and not those who remained in it. If the defendants are right in their contention, it would follow that if the conference had been a unit in declaring the amended constitution adopted, in which event its action would have been no more binding than now, the members of any local church might have seized the church property, on the ground that they were the sole representatives of the true church, and that all the others were heretics. The minority in this case have mistaken their remedy. They should have pursued a legal and orderly course, which was clearly open to them. They

should have protested, and, failing in this, have applied to the proper courts to determine the validity of the proceedings to adopt the amended constitution; and, if such courts found them void, they would hold the old constitution in force, and compel the officers of the church to recognize and act under it. This proposition seems to me so clear that I deem further argument unnecessary.

This disposition of the case renders it unnecessary to enter upon the discussion and adjudication of the regularity of the proceedings. It follows that the complainants derive their authority from the regularly-organized conference, that they are the representatives and trustees of the church, and as such are entitled to the use and possession of the property.

Decree should be affirmed, with costs.

MCGRATH, J. I agree with my Brother GRANT that the constitution of 1841 was a valid instrument, and as such was binding upon the society. It had been acquiesced in, recognized, and accepted as the fundamental law of the society for nearly 50 years. Can there be any doubt upon this record that the majority has proceeded in utter disregard of the plain provisions of that constitution? and must the constitution-abiding members of this society be ousted from the possession of property held and occupied by them, and devoted to uses contemplated thereby? This is the issue.

One of the objects of the constitution, as expressed by that instrument, is to define the powers and the business of the general conference. By that instrument that body is delegated certain powers, subject to the limitations and restrictions therein prescribed. The general conference is given power to make or repeal any rule of discipline, but it is expressly provided that no rule shall be passed "to change or do away with the confession of faith as it now

stands," or that will infringe upon the rights of any as relates to the mode of baptism, the sacrament of the Lord's supper, or the washing of feet, or that will deprive local preachers of their votes at annual conferences; and it is expressly provided that "there shall be no connection with secret combinations," and that "there shall be no alteration of the foregoing constitution, unless by request of two-thirds of the whole society." The question to be determined is not whether the action taken is or is not included within the scope of general powers conferred, or whether the authority may or may not be fairly implied, or whether the power is one which does or does not belong to or inhere in a body of this character. Those questions are settled by the contract itself.

At a session of the general conference held in 1885, the bishops' address contained the following:

"We need not say to your honorable body that the subject of secret societies has become a most perplexing one to our Zion. This is well known to you all. Also, it is expected of you by the people whom you represent that under the blessing of God you will put this subject to rest, and bring peace to the church by wise regulations. To this end we recommend:

"First. In that it is admitted that our present constitution has not been as yet submitted to a vote of the whole society, you determine whether the whole subject under consideration is or is not yet in the hands of the general conference.

"Second. Should you determine that it is in your hands, then transfer the whole subject from the realm of constitutional law to the field of legislative enactment, which would be to expunge the whole question from the constitution, and bring it into the field of legislative enactment, to be handled as the church, through her representatives, may determine from time to time.

"Third. That you limit the prohibitory feature of your enactment to combinations, secret and open, to which the church believes a Christian cannot belong.

"Fourth. Should you decide that this constitutional question is beyond your control, and in the hands of the

whole society, then submit the above propositions, properly formulated, to a vote of the whole church,* and let a two-thirds vote of those voting be the authoritative voice of the church on the subject."

In the report of the committee raised in 1885 the following occurs:

"*First.* We find that the present constitution of the church was never submitted to the suffrage of the members and ministry of the church for ratification, either by popular vote or by conventional approval, though it purports to be the constitution of the 'members' of the denomination.

"*Second.* We find, by reference to the records, that throughout most of its history it has been the subject of question and differences of opinion as to its legality and binding force as an organic law.

"*Third.* We find also that the clause found in article 2, section 4, which says, 'No rule or ordinance shall at any time be passed to change or do away with the confession of faith, as it now stands,' and article 4, which says, 'There shall be no alteration of the foregoing constitution, unless by request of two-thirds of the whole society,' are, *in their language and apparent meaning, so far-reaching as to render them extraordinary and impracticable as articles of constitutional law.*

"*Fourth.* From the facts and reasons thus indicated, we conclude that the constitution has acquired its force only by the partial and silent assent of the church, and that the general conference has a right to institute measures looking to the amendment, modification, or change of the constitution at any time when it is believed that a majority of our people favor a modification thereof.

"*Fifth.* It is the sense and belief of your committee that the constitution, as it stands, is not in harmony with the present wishes of our people, as has been indicated in discussions, petitions, and elections during the past year.

"*Sixth.* For these reasons, and for the purpose of finally settling all *questions of dispute and matters of disturbance to the peace and harmony of the church so far as the confession of faith and the constitution* are concerned, your committee would recommend the adoption of the following paper, namely:

" ' CHURCH COMMISSION.

" ' *Whereas,* our confession of faith is *silent or ambiguous upon some of the cardinal doctrines of the Bible,* as held and believed by our church; and—

" *Whereas,* it is desirable and needful to so amend and approve our present constitution as to adapt its provisions more fully to the wants and conditions of the church in this and in future time: Therefore     *     *     *     *     *     *     *     *     *     *

" The duties and powers of this commission shall be to consider our present confession of faith and constitution, and prepare such a form of belief, and such amended fundamental rules for the government of this church in the future, as will, in their judgment, be best adapted to secure its growth and efficiency in the work of evangelizing the world: *Provided*—

" ' 1. That this commission shall preserve unchanged, in substance, the present confession of faith, so far as it is clear.

" ' 2. That it shall also retain the present itinerant plan.

" ' 3. It shall keep sacred the general usages and distinctive principles of the church on all great moral reforms, as sustained by the Word of God, in so far as the province of their work may touch them.     *     *     *     *     *     *     *     *     *     *     *     *     *

" ' *Resolved,* That when, according to the foregoing provisions, the result of the vote of the church shows that two-thirds of all the votes cast have been given in approval of the proposed confession of faith and constitution, it shall be the duty of the bishops to publish and proclaim said result through the official organs of the church, whereupon the confession of faith and constitution thus ratified and adopted shall become the fundamental belief and organic law of the church.' "

In accordance with the action of the conference, the bishops published a letter, addressed to the church, on the work of the commission, in which the following occurs:

" In the confession of faith three things were effected: First, some verbal changes and reconstruction of sentences for the sake of grammatical accuracy and definiteness of expression; second, a systematic arrangement of our present confession of faith, under distinct articles; third, the addition of *five new articles,* namely, of justification, of regeneration and adoption, of sanctification, of the Christian Sabbath, and of a future state.

" *These changes* secure correct grammatical construction, systematic arrangement, clearness of expression, *and a fuller and more comprehensive view of the doctrines of the Scrip-*

*tures.* We believe the utility of *these changes* is so apparent that they will be acceptable to you, and will receive your indorsement."

In the address of the bishops at the session of 1889, the following occurs:

" It is sadly known throughout the church that there has been for a time a *growing friction* along the line of what has been known as the organic law of the church. Two antagonistic views have obtained and found ample advocacy in the past. The one is that we have a valid constitution of absolute and unquestioned force, binding on all the members of the church, and also so bounding, restricting, and limiting the action of the general conference itself that it cannot legislate along certain lines, nor adopt certain measures, *well defined in the limiting terms of the constitution,* without being guilty of usurpation and revolution. The other view is that the general conference, being a constitutional body, has judicial powers, is capable of judicial action, and hence, being the highest authority known in the jurisprudence of the church, may by right adjudicate questions of dispute, interpret and construe law, as well as devise and formulate plans for the furtherance of its benevolent designs and its mission of mercy among men.

" It is furthermore held that *the restrictions which have been supposed to form an impassable barrier to the authority of the general conference are so far-reaching in their demands, and so ambiguous in their meaning, as to render them utterly untenable in a day of advanced thought and of expanding measures. It has been in a measure demonstrated that a feature of absolute immutability has been impressed on her constitution, so that its amendment, according to its own terms, is an utter impossibility. This absolutism in our system, this inflexibility of provision for amendment, is being regarded, in the light of recent experience, as exceedingly unfortunate.*"

The new confession of faith contains 13 articles. The changes made are given below. The words in parentheses were in the old confession, but have been stricken from the new. The words in italics were not in the old, but have been added to the new.

"Article 2. We believe that this triune God created the heavens and the earth, and all that in them is, visible and invisible (and, furthermore, sustains, governs, protects, and supports the same); *that He sustains, protects, and governs these with gracious regard for the welfare of man, to the glory of His name.*"

"Art. 3. We believe in Jesus Christ; that He is very God and man; that He became incarnate by the power of the Holy Ghost (in the Virgin Mary), and was born of (her); *the Virgin Mary;* that He is the Savior and Mediator of the whole human race, if they, with full faith (in Him), accept the grace proffered in Jesus; that this Jesus suffered and died,    *    *    *    and will come again at the last day, to judge the (quick) *living* and the dead.

"Art. 4. We believe in the Holy Ghost; that He is equal in being with the Father and the Son; *that He convinces the world of sin, of righteousness, and of judgment;* that He comforts the faithful, and guides them into all truth.

" Art. 5.   We believe that the Holy Bible, Old and New Testaments, is the word of God; that it (contains) *reveals* the only true way to our salvation; that every true Christian is bound to acknowledge and receive it (with the influence) *by the help* of the spirit of God, as the only rule and guide *in faith and practice,* (and that, without faith in Jesus Christ, true repentance, forgiveness of sins, and following after Christ, no one can be a true Christian.   We also believe that what is contained in the holy Scriptures, to wit, the fall in Adam and redemption through Jesus Christ, shall be preached throughout the world).

" Art. 6.   We believe in a holy Christian church (the communion of saints, the resurrection of the body, and life everlasting), *composed of true believers, in which the Word of God is preached by men divinely called, and the ordinances are duly administered; that this divine institution is for the maintenance of worship, for the edification of believers, and the conversion of the world to Christ.*

"Art. 7.   We believe that the (ordinances) *sacraments,* baptism and (the remembrance of the sufferings and death of our Lord Jesus Christ) *the Lord's supper,* are to be in use *in the church,* and *should be* practiced by all (Christian societies) *Christians* (and that it is incumbent on all the children of God particularly to practice them); but the (manner in which ought) *mode of baptism, and the manner of observing the Lord's supper, are* always to be left to the judgment and understanding of every individual.   *Also the*

*baptism of children shall be left to the judgment of believing parents.* The example of the washing of feet is to be left to the judgment of each one, to practice or not; (but it is not becoming of any of our preachers or members to traduce any of their brethren whose judgment and understanding in these respects is different from their own, either in public or in private. Whosoever shall make himself guilty in this respect shall be considered a traducer of his brethren, and shall be answerable for the same.)

"*Art. 8. We believe that man is fallen from original righteousness, and, apart from the grace of our Lord Jesus Christ, is not only entirely destitute of holiness, but is inclined to evil, and only evil, and that continually; and that, except a man be born again, he cannot see the kingdom of heaven.*

"*Art. 9. We believe that penitent sinners are justified before God, only by faith in our Lord Jesus Christ, and not by works; yet that good works in Christ are acceptable to God, and spring out of a true and living faith.*

"*Art. 10. We believe that regeneration is the renewal of the heart of man after the image of God, through the Word, by the act of the Holy Ghost, by which the believer receives the spirit of adoption, and is enabled to serve God with the will and the affections.*

"*Art. 11. We believe that sanctification is the work of God's grace, through the Word and the spirit, by which those who have been born again are separated in their acts, words, and thoughts from sin, and are enabled to live unto God, and to follow holiness, without which no man shall see the Lord.*

"*Art. 12. We believe that the Christian Sabbath is divinely appointed; that it is commemorative of our Lord's resurrection from the grave, and is an emblem of our eternal rest; that it is essential to the welfare of the civil community, and to the permanence and growth of the Christian church; and that it should be reverently observed as a day of holy rest, and of social and public worship.*

"*Art. 13. We believe in the resurrection of the dead, the future general judgment, and an eternal state of rewards, in which the righteous dwell in endless life, and the wicked in endless punishment.*"

The old constitution provided that the general conference "shall consist of elders, elected by the members in every conference district throughout the society." The new con-

stitution provides that the general conference "shall consist of elders and laymen elected in each annual conference district throughout the church. The number and ratio of elders and laymen, and the mode of their election, shall be determined by the general conference." The new constitution further provides that—

"The ministerial and lay delegates shall deliberate and vote together as one body; but the general conference shall have power to provide for a vote by separate orders, whenever it deems it best to do so; and in such cases the concurrent vote of both orders shall be necessary to complete an action."

Section 10 of article 1 provides that—

"The general conference may, two-thirds of the members elected thereto concurring, propose changes in or additions to the confession of faith: *Provided*, that the concurrence of three-fourths of the annual conferences shall be necessary to their final ratification."

Section 1 of article 3 is as follows:

"We declare that all secret combinations which infringe upon the rights of those outside their organization, and whose principles and practices are injurious to the Christian character of their members, are contrary to the Word of God, and that Christians ought to have no connection with them. The general conference shall have power to enact such rules of discipline with respect to such combinations as in its judgment it may deem proper."

Section 1 of article 5 provides that amendments may be proposed by any general conference, two-thirds of the members elected thereto concurring, which amendments shall be submitted to a vote of the membership, and a majority of all the votes cast shall be necessary to final ratification.

It is idle to say that there has been no change in the confession of faith. It will not be contended that the questions in respect to which either the confession of faith or the constitution of 1841 was *silent* or ambiguous, or in respect to which the additions, changes, or modifications

were made by the commission, were in any sense new, or had their origin in the commission. These subjects had been discussed at the various conferences since the adoption of the constitution of 1841. The changes involved matters upon which eminent divines have differed, and which have been the subject of controversy for centuries; matters concerning which wide differences of opinion existed in the several conferences. The subjects of infant baptism, of the washing of feet, of natural, hereditary, and total depravity, of a lay delegation, and of secret combinations, had been frequently discussed. In 1853 a resolution defining natural, hereditary, and total depravity had been adopted by a vote of 23 to 19. A secret combination had been defined as "one whose initiatory ceremony or bond of union is a secret."

In view of the multiplicity of existing sects, all declaring a belief in the same Scriptures, but differing in interpretation, how can it be claimed that there was no change in the confession of faith? Can it be said that articles may be added to a confession of faith, declaring a belief in "depravity," "justification," "regeneration and adoption," "sanctification," and "endless punishment," and that the confession has not been changed by the additions? It is no answer to say that, in the revision, matter was simply transferred from discipline to confession, for the confession was the paramount law. The general conference had the power to formulate rules of discipline, but it was restricted to rules which should not change the confession. If rules had been adopted which pertained to the confession of faith, and had the effect to change, add to, or vary the creed, they were illegally adopted, were without binding force, and had no place in either discipline or creed. The proponents of change had constantly been met with the point of order that such change was prohibited by the

constitution, and as constantly by the ruling that the point of order was well taken.

The record, including the proceedings of the conference, will be searched in vain for any determination by the general conference, or any committee thereof, or by the commission, that these modifications or alterations or additions to the confession of faith were immaterial, and did not add to or vary or change the confession. Indeed, an examination of the proceedings, of the report of the committee of 1885, and of the address of the bishops, leads inevitably to the conclusion that these changes were regarded and construed as material, and the constitution of 1841 as prohibiting their enactment. As early as 1845, a resolution was adopted by a vote of 15 to 8 declaring "that, in view of the constitution, this general conference has no right to revise, alter, 'or amend the confession of faith as it now stands."

The commission of 1885 originated in a desire to settle disputed and vexed questions. The vote creating the commission stood 78 to 42. The utmost that can be said for the new confession and constitution is that these questions have been settled in accordance with the views of the proponents of change, and that the views of the opponents are no longer supported by the written articles.

Nor has the highest court of judicature of this society undertaken at any time to give to the clause of the constitution providing that the concurrence of two-thirds of the whole society should be necessary to the amendment any other meaning than that which its language clearly conveys. Indeed, it is evident from an examination of the proceedings of the general conference, from the report of the committee of 1885, and from the language of the bishops, that this article was understood, regarded, and interpreted to mean that the affirmative concurrence of two-

thirds of the whole society was necessary to amend the constitution. At the session of 1873 a motion was made that this clause be so interpreted as to mean two-thirds of all that vote, but the motion was laid on the table. The following resolution was then passed:

"*Resolved*, That the explicit rendering of article 4 of the constitution be submitted to the board of bishops, and that they be requested to publish the same in the Religious Telescope."

It does not appear by the journals that the bishops ever reported, but by the record it appears that the matter was discussed by the bishops, but no conclusion was reached. A motion was made in 1849 to " expunge" the constitution, on the ground of illegality; but there were but three votes in the affirmative.

It remained for the bishops, in 1885, to cut the knot. They recommended one of two courses, viz., that the constitution as a whole be disregarded, or to submit the new constitution to vote, and "let a two-thirds vote of those voting be the authoritative voice of the church." The bishops did not assume to interpret the constitutional provision in question, but suggested an edict declaring the two-thirds vote of those voting to be the authoritative voice of the church. The committee did not undertake an interpretation, but found that the objectionable clauses "are, in their language and *apparent meaning*, so far-reaching as to render them extraordinary and impracticable as articles of constitutional law." They further concluded that the constitution had acquired its force only by the partial and silent assent of the church, and that the conference had the right to institute measures looking to its amendment at any time when it was believed that a majority favored such amendment. A minority report was presented, but the majority report prevailed by a vote of 78 to 42.

98 Mich.—20.

The bishops, in their address in 1889, use this significant language:

"Certainly a church constitution should ·have some possible method· of procedure by which it could be amended. That those who gave us the constitution intended to put it practically beyond the possibility of alteration or modification has never been insisted upon; and yet the church found itself in *this very attitude* when it came to meet a growing demand for more pliant and equitable measures, arising from the exigencies of the times."

This language is entirely inconsistent with any other interpretation of this constitutional provision than that insisted upon by the defendants.

The constitution, as proposed in 1837, provided that—

"If, at any time after the passage of this constitution, it should be contemplated either to alter or amend the same, it shall be the privilege of any member in the society to publish such contemplation at least three months before the election of delegates to the general conference."

This was changed, before adoption, so as to make it necessary for two-thirds of. the whole society to request a change before it could be granted. The purpose of this provision was not to take away from the general conference all power to act, but to prevent action until the request was made. Any amendment suggested would be subject to the scrutiny of the conference. The request did not effect the amendment, but affirmative action by the conference on the request was necessary. ·

It was entirely competent for the members of this society to associate together under this compact; to formulate a summary of their distinctive beliefs; to exclude therefrom all disputed questions; to regard certain matters as nonessentials, and to leave certain others to individual judgment, determining that as to these questions the articles should be *silent;* to protect the exercise of that judgment

from criticism; and to surround the creed so formulated with such safeguards as they deemed proper and requisite. The creed so formulated was the basis of their association. To promulgate that creed, and protect themselves in certain observances, was the purpose of the society. To secure it from innovation was the object of the constitutional provision. They recognized the tenacity with which each member adhered to matters of belief as expressed, and the right to the exercise of individual judgment as to matters upon which no expression was given. The creed was agreed to, not only by reason of what it expressed, but also because of what it omitted; by reason as well of its concessions as of its requirements. They recognized the possibility of development and of agreement upon questions upon which no agreement was reached, and the right to change, but agreed that such development should be evidenced by the affirmative concurrence of two-thirds of the whole society. It was not alone matters of administration and government that they aimed for protection in, but matters of belief; the underlying principles of the association; the thought which the society was formed to advance. They formulated and declared the church polity, and by the fundamental law prohibited a change of that polity unless in accordance with express provision made in the constitution itself.

The relation between the members of this association is one of contract, and the confession of faith and the constitution constitute the terms of the agreement, which is binding upon all. *Hyde v. Woods*, 2 Sawy. 655, 94 U. S. 523; *White v. Brownell*, 2 Daly, 329; *Ebbinghousen v. Worth Club*, 4 Abb. N. C. 300, 301, note; *Leech v. Harris*, 2 Brewst. 571; *Venable v. Baptist Church*, 25 Kan. 177; *State v. Williams*, 75 N. C. 134; *Innes v. Wylie*, 1 Car. & K. 257; *Protchett v. Schaefer*, 11 Phila. 166; *Brine v. Board of Trade*, 2 Amer. Law Rec. 268.

In *White v. Brownell*, Van Vorst, J., says:

" As this association is not organized in pursuance of any statute, nor the terms of membership fixed by the principles of the common law, it follows that the agreement which the members make among themselves on the subject must establish and determine the rights of the parties on the subject. The constitution of the association and its laws, agreed upon by the members, contain all the stipulations of the parties, and is the law which should govern. The members have established a law for themselves. * * * The very existence of this body depends upon the faithful observance of its organic law by all its members. The court must regard the constitution and laws of this board as the contract by which all the members are bound. The court cannot make any other contract for the parties than they have solemnly made for themselves."

An amendment of the constitution of a society must be adopted in accordance with the provisions of the constitution in force at the time of such adoption respecting such amendment; otherwise, it is invalid. *Hochreiter's Appeal,* 93 Penn. St. 479; *Rottmann v. Bartling,* 22 Neb. 375; *State v. Swift,* 69 Ind. 505; *State v. Foraker,* 46 Ohio St. 677.

It is urged, however, that the judgments of ecclesiastical tribunals in matters of faith and discipline and the general polity of the church are binding upon civil courts. In the present case there has been no judicial determination of any matter of faith or discipline or general polity adverse to defendants. As already suggested, there has been no adjudication that the confession of faith has not been changed. There has been no attempted interpretation or construction of the constitutional provision in question, other than that insisted upon by the defendants; indeed, the "apparent meaning" of that provision has at all times been recognized. The edict adopted by the conference before the vote was had betrays the construction given to this provision. The conference openly and notoriously disregarded this plain and express provision of a contract

binding as well upon conference as individuals. The action taken cannot be raised to the plane of judicial action. It was a breach of compact, and revolutionary. The design was to secure legislative action merely. Even those voting in the affirmative cannot be presumed to have intended to violate the fundamental law requiring an affirmative expression from two-thirds of the whole society, or to give any other construction to the provision in question than that for which the defendants contend. The constitution negatived the authority to amend in any other manner than that indicated. Can it be insisted that less than two-thirds of the society, acting in a legislative capacity, could not amend, but that a less number could accomplish the same result, under the guise of an adjudication, without semblance of authority? The constitution relegated the subject-matter to the society,—to the legislative power. This is not a case of the excommunication of a member who has submitted himself to the authority of an organization having power, either express or implied, to deal with that question. Here we have an express limitation of power. The only authority to which the membership of this society have submitted themselves with respect to the matter in question is the affirmative expression of two-thirds of the whole society. Church judicatories cannot usurp legislative powers. The creation of judicial tribunals and their investment with authority is one of the functions of the sovereign power.

But it is insisted that the decision of the conference that the new constitution and confession of faith had become the fundamental belief and constitution of the society is binding upon this Court. The question here involved is one of ownership of property. These proceedings are instituted to recover possession and control of that property. In this class of cases the conclusive effect of church authority, acting within the scope of its powers, is fully

recognized by all the cases, and it is as well settled that civil courts will not review the decisions of ecclesiastical judicatories upon the merits; but the proposition that the judgments of church judicatories as to their own powers or jurisdiction, or the lawfulness of their methods, are conclusive, is not sustained by reason or the weight of authority.

In *Chase v. Cheney*, 58 Ill. 509, it was expressly held that civil courts will interfere with churches or religious associations when rights of property or civil rights are involved. It was held, however, that, where there is no other right involved than a clerical office, the decision of an ecclesiastical court as to its own jurisdiction under the canons of the society is conclusive.

*Watson v. Jones*, 13 Wall. 679, involved the powers of the general assembly of the Presbyterian Church. The constitution of that body provides that—

"To the general assembly also belongs the power of deciding in all controversies respecting doctrine and discipline; of reproving, warning, or hearing testimony against any error in doctrine or immorality in practice, in any church, presbytery, or synod; * * * of superintending the concerns of the whole church; * * * of suppressing schismatical contentions and disputations; and, in general, of recommending and attempting reformation of manners, and the promotion of charity, truth, and holiness, through all the churches under their care."

In all of the cases in which any question as to the authority of the general assembly under this constitutional provision has been raised, it has been held that the authority was practically unlimited. *State v. Farris*, 45 Mo. 183. Mr. Justice Miller concedes that the doctrine of the English courts is opposed to the proposition announced by him. The English cases are collated and considered by Mr. (Justice) Fuller in a note to *Chase v. Cheney*, 10 Amer. Law Reg. (N. S.) 313.

In the cases cited by Mr. Justice Miller, the question of

the power, authority, and jurisdiction of the tribunals whose acts were under consideration is fully considered and discussed, and the respect paid to those tribunals is predicated upon authority conferred.

In *Gibson v. Armstrong*, 7 B. Mon. 481, the court discuss at length the general and unlimited powers of the conference, and say:

" There would seem to be due from the tribunals of the civil government to those of the church at least so much respect as to require. that the acts done by the latter in the name of the church should be deemed valid under its law, and that the dependent right should be determined accordingly until those acts were reversed by the church, *or at least until they were conclusively demonstrated to be against its law.*"

In *Harmon v. Dreher*, 1 Speers, Eq. 87, Dreher had been declared no longer a minister of the society. The court say:

" That the synod here was armed with judicial authority for .trying and determining cases against delinquent ministers and churches appears from the constitution itself, which is the rule for all who have acceded to it, and which expressly provides for such a procedure."

*Shannon v. Frost*, 3 B. Mon. 257, arose out of a controversy in a Baptist society, which had no constitution and acknowledged no ecclesiastical authority, the voice of the majority of the congregation being of necessity the voice of the church.

In *Den v. Bolton*, 12 N. J. Law, 206, 220, the court say:

" The sentence of suspension, then, appears to have been a judgment of a competent court within its jurisdiction, *having authority over the party and the subject,* liable to an appeal to a higher tribunal by any one aggrieved, from which, however, no appeal was taken, and to which, therefore, we are bound, sitting in another judicatory, to give respect and effect. * * * The jurisdiction of the classis in such case is, I think, *fully sustained by the con-*

*stilution.*    *    *    *    Here are, then, the sentences of a
competent tribunal, in the exercise of its constitutional
jurisdiction, deposing the elders and deacons, as well as
the minister, from their respective offices."

In *Ferraria v. Vasconcelles,* 23 Ill. 456, it was held that,
after individuals or organized bodies have entered into a
compact or agreement, it requires the assent of the con-
tracting parties to abrogate the agreement, and no reason
is perceived on this principle why a church which, by com-
pact, has become a portion of the presbytery, should have
the voluntary right to withdraw from the organization with-
out mutual consent.

In *State v. Farris,* 45 Mo. 183, it was expressly held that
the general assembly of the Presbyterian Church possessed
unlimited juridiction in relation to the matter in dispute.

In *German Reformed Church v. Seibert,* 3 Penn. St. 282,
Seibert was excommunicated by the consistory. The articles
gave him a right to appeal to the classis, and from thence
to the synod. He did not avail himself of either, and the
case is put upon the ground that, until final adjudication
by the church judicatories, the relator was without remedy
by *mandamus.* The court say:

" Whatever is concluded in such [final] judicatory by a
majority of votes is valid and binding unless it can be
shown to be contrary to the word of God and the consti-
tution of the church."

In *McGinnis v. Watson,* 41 Penn. St. 9, the court finds
that—

" The act of the synod is binding upon the congrega-
tions composing it as members *so far as the act is in accord-
ance* with its own laws ;" that " *in none of these matters
has the synod transcended its usual authority.*" They say:
" We might have decided this case by saying that there is
nothing in the plaintiff's evidence that shows that the
action complained of, *judged by the constitution and usages
of the seceder church,* was brought about by any excess of
authority on the part of the presbyteries and synod; but

we have preferred to treat the case as if the burden of proof was on the defendants, and show affirmatively that the proceeding is in harmony with the authority usually admitted to belong to those bodies."

In *Schnorr's Appeal*, 67 Penn. St. 138, it was held that, in church organizations, those who adhere to the regular order of the church, local and general, though a minority, are the true congregation; that the title to the church property of a divided congregation is in that part of it which is acting in harmony with its own law, and the ecclesiastical laws, usages, customs, and principles which were accepted among them before the dispute began are the standards for determining which party is right. Mr. Justice Sharswood, in that case, says:

"If the opinion of Chief Justice Lowrie, in *McGinnis v. Watson*, may seem to controvert any of these positions, and to hold that a congregation may change a material part of its principles or practices without forfeiting its property, on the ground that to deny this 'would be imposing a law upon all churches that is contrary to the very nature of all intellectual and spiritual life,' and because the guaranty of freedom to religion forbids us to understand the rule in this way, I ask leave most respectfully to enter against it my dissent and protest. I do so the more freely because it was entirely extrajudicial to any question in the case. Courts which have the supervision and control of all corporations and unincorporated societies or associations must be guided by surer and clearer principles than those to be derived from the nature of intellectual and spiritual life. The guaranty of religious freedom has nothing to do with the property. It does not guarantee freedom to steal churches. It secures to individuals the right of withdrawing, forming a new society, with such creed and government as they please, raising from their own means another fund, and building another house of worship; but it does not confer upon them the right of taking the property consecrated to other uses by those who may now be sleeping in their graves. The law of intellectual and spiritual life is not the higher law, but must yield to the law of the land."

In *Kerr's Appeal*, 89 Penn. St. 97, the court held that

the resolution adopted by the church synod was *ultra vires;* that a decree of the church judicatory is binding only where it is affirmatively shown that it has acted within the scope of its authority, and has observed its own organic forms and rules.

In a note to *Gartin v. Penick* (Ky.), 9 Amer. Law Reg. (N. S.) 210, 221, Mr. Redfield says:

"We do not understand that any such presumption in favor of the jurisdiction of these church judicatories exists as in the case of the superior courts of general jurisdiction in the state or nation; but, on the contrary, everything requisite to create the jurisdiction must be proved affirmatively by any who claim the benefit of their action, as in the case of courts of limited and summary powers within the state, or of all foreign courts, as church courts surely may be regarded. But, when this is shown, we suppose the judgments of church courts and assemblies are as conclusive as those of any other tribunal. It is like the case of a reference or arbitration.        *        *        *        *        *

"But, as we have before said, the mere decision of a court of summary jurisdiction, or of an arbitration, or a foreign court is not even *prima facie* evidence of its binding obligations upon the parties. Something more must be shown, because the law does not presume in favor of the jurisdiction or of the regularity of the proceedings. These must be shown before any such decision becomes obligatory. The case of an arbitration will well illustrate the whole subject. The submission must be shown, or, in the case of an ecclesiastical court, that the persons and the subject-matter come within the range of its control."

Mr. Redfield further discusses the question in a note to *Chase v. Cheney,* 10 Amer. Law Reg. (N. S.) 308, and to the same case is appended a note by Mr. Fuller, where the whole subject is ably and exhaustively discussed. Mr. Redfield says:

"There can be no question, we apprehend, that an ecclesiastical court must be considered one of special and limited jurisdiction.        *        *        *        If such a court be a domestic one, whose judgments can only appear by its record, the jurisdiction of the court, both in regard to the

subject-matter and the parties, must appear upon the record, and unless it do so appear the judgment cannot be upheld. It must be further conceded, in regard to ecclesiastical courts in this country, that they must, as to the civil tribunals of the state or nation, stand upon the same basis as foreign courts."

It has been expressly held by this Court that the provision of the Federal Constitution that full faith and credit shall be given in each state to the records and judicial proceedings of every other state does not preclude an inquiry into the jurisdiction of courts; and if, in fact, the subject-matter of a suit was not within the jurisdiction of the state from which the court derives its authority, its judgment is a nullity, and may be so treated everywhere. *People v. Dawell,* 25 Mich. 247; *Wright v. Wright,* 24 Id. 180; *McEwan v. Zimmer,* 38 Id. 765.

In *Connitt v. Church,* 54 N. Y. 551, the classis had dissolved a pastoral relation. An appeal was taken to the particular synod, and then to the general synod, where the decision was affirmed. The court expressly find that the classis had jurisdiction to make the decision, and dissent from the view expressed in *Chase v. Cheney* and *Watson v. Jones,*—that the decision of an ecclesiastical tribunal as to its own jurisdiction is conclusive upon the civil courts.

In *Earle v. Wood,* 8 Cush. 430, the court, after discussing the powers conferred upon the yearly meeting by the constitution and usages of the society, find that—

" The yearly meeting has a final and controlling jurisdiction in all matters of faith and religious duty, of administration and discipline, as well as of manners and conduct of all Quakers within its limits."

In *Watson v. Avery,* 2 Bush, 332, 349, Mr. Justice Hardin, speaking for the court, says:

" If it be true, as insisted for the appellees, that the inferior courts and people of the church are bound to accept as final and conclusive the assembly's own construction of

its powers, and submit to its edicts as obligatory, without inquiring whether they transcend the barriers of the constitution or not, the will of the assembly, and not the constitution, becomes the fundamental law of the church.

"But the constitution, having been adopted as the supreme law of the church, must be supreme alike over the assembly and people. If it is not, and only binding on the latter, the supreme judicatory is at once a government of despotic and unlimited powers. But we hold that the assembly, like other courts, is limited in its authority by the law under which it acts; and, when rights of property which are secured to congregations and individuals by the organic law of the church are violated by unconstitutional acts of the higher courts, the parties thus aggrieved are entitled to relief in the civil courts, as in ordinary cases of injury resulting from the violation of a contract or the fundamental law of a voluntary association."

See, also, *Gartin v. Penick, supra*; *Associate Reformed Church v. Trustees*, 4 N. J. Eq. 77; *Livingston v. Rector*, 45 N. J. Law, 230; *Rottman v. Bartling*, 22 Neb. 375; *Com. v. Green*, 4 Whart. 603; *Green v. Society*, 1 Serg. & R. 254; *Runkel v. Winemiller*, 4 Har. & McH. 429; *Brosius v. Reuter*, 1 Har. & J. 551; *Thompson v. Society*, 7 Pick. 160; *Harrison v. Hoyle*, 24 Ohio St. 254.

The edicts and declarations of the conference contravened the organic law of the society, and were *ultra vires*. It has been frequently determined that the title to church property of a divided congregation is in that part of it which is acting in harmony with its own law, and the ecclesiastical laws, usages, customs, and principles which were accepted among them before the dispute began are the standard for determining which faction is right. *McGinnis v. Watson, Schnorr's Appeal*, and *Ferraria v. Vasconcelles, supra*. Mr. Justice Strong, in his valuable work on the Relations of Civil Law to Church Polity (pages 45–59), says:

"Cases sometimes arise in civil courts in which it becomes necessary to determine *which part of a divided church* is

entitled to the church property.    *    *    *    In such a case,    *    *    *    courts of law will inquire *which party, or which division, adheres to the form of church government*, or acknowledges the church connection designated in the conveyance, and adjudge the right to *that party*.    *    *    * That property the civil courts will adjudge to the members, *however few in numbers* they may be.    *    *    * This rule    *    *    * necessitates an inquiry intó the constitution and discipline of the church    *    *  .  * to enable the court to discover which of the contending parties adheres to the order.    *    *    *
Civil courts will not permit the diversion of a trust.    *    *    * When property is held charged with a trust for the use of a church receiving and maintaining certain religious doctrines, it occasionally happens that its members *depart from the faith*, and embrace other and contrary doctrines, while still claiming to hold the church property. In such a case, if the property *can be* retained by them, it is diverted from the use to which it was first settled.    *    *    * Such a perversion the civil law *will not allow*. It will interpose its strongest arm to arrest it.    *    *    * Courts of law *will institute all inquiries necessary* to determine who were the real beneficiaries intended, and prevent the diversion of the property to any other uses; and in so doing they will, if necessary, investigate the doctrines held, or the religious belief of the members,    *    *    * to identify the persons for whose use the grant or gift was originally intended."

The defendants are in possession. They adhere to the old constitution and confession of faith. Neither has been lawfully changed. The adherents of the new constitution refused longer to submit to the organic law of the association, and have in effect formed a new society. When the conference trampled upon the compact, its jurisdiction ceased to be legitimate. The right to the property does not depend upon numbers, nor upon the fact that the members of the conference whose conduct was revolutionary were able, by force of numbers, to hold the opera house in which the conference convened, and force those who insisted upon the integrity of the fundamental law to acquiesce or depart. The question is, which of the two factions adheres to the

confession of faith and constitution in force when the dispute began,—which remains loyal to the compact of association? The inquiry is not, who went out of the *opera house?* but, who remained in the *Church,* subject to its organic law?

The decrée below must be reversed, and the bill dismissed.

HOOKER, C. J., and LONG, J., concurred with MCGRATH, J. MONTGOMERY, J., did not sit.