RAMSEY ET AL. v. HICKS ET AL.

[No. 6,948. Filed April 23, 1909. Rehearing denied October 29, 1909.]

1. RELIGIOUS SOCIETIES.— Freedom.— Constitutional Provisions.— In determining the rights of churches and the members thereof the federal and state constitutional provisions should be carefully and scrupulously regarded. p. 503.

2. RELIGIOUS SOCIETIES.—Unions of.—Mutual Benefit Associations. —Religious societies are treated by the courts like other voluntary associations for benevolent or charitable purposes, their rights of property and of contract being equally under the protection of the law, and the actions of their members being subject to the law's restraints. p. 504.

3. RELIGIOUS SOCIETIES.—Rules.—Revolt Against.—Rights of Minority.—The minority of a church, who submit to its rules and

doctrines, will be considered by the civil courts as the true congregation, where the majority rebel against the lawfully constituted authorities of such church. p. 504.

4. RELIGIOUS SOCIETIES.— *Cumberland Presbyterian Church.— Union.—How Effected.*—The Cumberland Presbyterian Church may unite with another church only by submitting the question, proposed by the assembly, first to the different church sessions, which may elect delegates to the presbyteries, and if a majority of the presbyteries favor such union, it may be consummated. p. 505.

5. RELIGIOUS SOCIETIES.—*Constitutions.—Amendments.—Powers.*— The governing body of a church has only those powers expressly or impliedly granted by the constitution of such church, and if some object is desired that is not so included, an amendment to the constitution is the proper mode to secure such object. p. 506.

6. RELIGIOUS SOCIETIES.—*Union.—Presbyterian.*—The Cumberland Presbyterian Church had a right to unite with the Presbyterian Church in the United States of America, the inherent power to do which rested with the members thereof. p. 508.

7. RELIGIOUS SOCIETIES.—*Cumberland Presbyterian Church.—Assembly.—Powers.*—The assembly of the Cumberland Presbyterian Church, which, by the constitution, was authorized "to concert measures for promoting the prosperity and enlargement of the church" and "to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrine and order of this church," and whose power was limited "by the express provision of the constitution," had no authority to merge or abandon its own organization. p. 508.

8. RELIGIOUS SOCIETIES.— *Cumberland Presbyterian Church.— Union.—Power.*—Where the assembly of the Cumberland Presbyterian Church voted to submit to its members two propositions for union with the Presbyterian Church in the United States of America, (1) that such churches be united under the name of the latter, the former giving up its name, creed and organization, and (2) that the confession of faith of the latter be adopted, and the latter only of the two propositions was submitted, and that in a modified form, the assembly of the former church has no constitutional right to form a union by giving up the name, creed and organization of such church, there being no amendment to the constitution giving it such power. p. 509.

9. WORDS AND PHRASES.— *"Merge."— "Merger."*— The word "merge" means to "swallow up," and "merger" imports the absorption of a thing of lesser importance by a greater, whereby the lesser ceases to exist but the greater is not increased. p. 511.

10. CORPORATIONS.— *Consolidation.— Effect.* — A consolidation of companies imports the extinguishment of the consolidating com-

panies and the creation of a new one which takes over the property of the extinguished ones.   p. 511.

11.   RELIGIOUS SOCIETIES.—*Union.*—*Meaning.*—The union of two churches does not necessarily require the surrender of the organizations, or the extinguishment of such churches, and a vote to unite is not necessarily a vote to merge or consolidate.   p. 511.

12.   RELIGIOUS SOCIETIES.— *Property.*— *Trusts.*— Property conveyed to trustees for the use of a certain church must be held in trust for the promulgation of the tenets and doctrines of such church; and in case of a division, such property vests in that part of the congregation acting in harmony with the laws, usages, and principles of such church.   p. 512.

13.   RELIGIOUS SOCIETIES.— *Presbyterian Church.*— *Cumberland Presbyterian Church.*—*Distinction.*—The principal difference between the Presbyterian Church in the United States of America, and the Cumberland Presbyterian Church, is that the former asserts, while the latter denies, the doctrine of predestination. p. 513.

14.   RELIGIOUS SOCIETIES.—*Decisions of Highest Court Therein.*— *Effect of, on Civil Courts.*—The decisions of the highest courts of a church, as to matters of discipline, faith, custom, or church law, are ordinarily final with the civil courts.   p. 514.

15.   RELIGIOUS SOCIETIES.—*Property Held in Trust for.*—*Control Over, by Courts.*—Where property is granted or devised in trust for the advancement of a certain faith, the courts will take jurisdiction of the matter so far as to compel the use of such property for the purposes mentioned in the deed or will, even though a majority of the members of such church have changed their faith.   p. 515.

16.   RELIGIOUS SOCIETIES.—*Schism.*—*Right of Majority to Decide on.*—Where property interests are in controversy, the decision of a majority of the highest tribunal of a church that a certain part of a church membership constitutes the true church, is not binding on the civil courts.   pp. 517, 518, 523.

17.   RELIGIOUS SOCIETIES.—*Cumberland Presbyterian Church.*—*Independence of.*—The Cumberland Presbyterian Church is a separate, independent church, having a government of its own.   p. 518.

18.   COURTS.— *Jurisdiction.*— *Ecclesiastical Matters.*— Courts have no jurisdiction to determine purely ecclesiastical matters.   p. 519.

19.   COURTS.— *Jurisdiction.*— *Churches.*— *Schisms.*— *Property.*— Where the title to property is in question, the courts will determine which of two church claimants is the true one and entitled to the property.   p. 519.

20.   RELIGIOUS SOCIETIES.—*Presbyterian Churches.*—*Union.*—There can be no consolidation of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church until the articles of faith are made the same.   pp. 520, 522.

21. ESTOPPEL.—*Denying Grantor's Title.*—*Churches.*—The Presbyterian Church in the United States of America is estopped to deny the title of the Cumberland Presbyterian Church to certain property, held in trust for the general uses of such church, which the former church is claiming by virtue of being the successor in interest of the latter church. p. 523.

22. RELIGIOUS SOCIETIES.—*Schisms.*—*What Are.*—Where a part of the Cumberland Presbyterian Church claims, and a part denies, that such church has united with another church, and such church has divided and is now in litigation over the church property, a schism exists. p. 523.

23. RELIGIOUS SOCIETIES.—*Judgments.*—*Fraud.*—A church judgment vitiated by fraud, will not be binding on the civil courts. p. 524.

24. RELIGIOUS SOCIETIES.—*Union.*—The union of churches should be wholly voluntary. p. 525.

From Superior Court of Vanderburgh County; *Alexander Gilchrist,* Judge.

Action by James W. Ramsey and others, as trustees of the Washington congregation of the Cumberland Presbyterian church in Daviess County, Indiana, against Joseph P. Hicks, and others. From a judgment for defendants, plaintiffs appeal. *Reversed.* (For decision on transfer to Supreme Court, see 174 Ind. —).

*William Reister, George W. Shaw, W. C. Caldwell* and *Heffernan & Mattingly,* for appellants.

*A. P. Humphrey, John M. Gaut, Joel E. Williamson, Ogdon & Inman* and *Hastings, Allen & Hastings,* for appellees.

ROBY, J.—This is an action of ejectment, brought by the appellants against the appellees, to recover possession of a certain lot of ground on which are situated the house of worship and manse of the Washington congregation of the Cumberland Presbyterian Church, in Daviess county, Indiana, and for mesne profits during the wrongful and unlawful detention thereof. The complaint is in the statutory form, and the answer is a general denial. The finding and judgment were for the defendants. Plaintiffs' motion for a new trial was overruled, and such ruling is the basis of error assigned.

The litigation grew out of proceedings had to unite the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church. Appellants deny that such union was accomplished, and are here as representatives of the Cumberland Presbyterian Church. The appellees, asserting that the Cumberland Presbyterian Church was incorporated into the Presbyterian Church in the United States of America, claim the property in question for that organization. Which of the bodies is the owner of the real estate depends upon certain legal propositions, to understand which, it seems to be necessary to set out facts at considerable detail.

The confession of faith of the Presbyterian Church was formed by what is known in history as the Westminster Assembly. This body was appointed by the long parliament of England. It consisted of 123 clergymen and 30 laymen—10 of whom were lords and 20 commoners—together with 4 clerical and 2 lay commissioners from the church of Scotland. This notable assembly held its first meeting on July 1, 1643, and continued to sit till February 22, 1649—six years. The doctrines agreed upon by that convocation constitute the confession of faith of the Presbyterian Church. Because the theological views adopted were, in the main, those of John Calvin, those who adhere to that system are called Calvinists. Certain articles of that creed are as follows:

"III. By the decree of God, for the manifestation of His glory, some men and angels are predestined unto everlasting life, and others foreordained to everlasting death.

IV. These angels and men, thus predestined and foreordained, are particularly and unchangeably designed; and their number is so certain and definite that it cannot be either increased or diminished.

V. Those of mankind that are predestined unto life, God, before the foundation of the world was laid, according to His eternal and immutable purpose, and the secret counsel and good pleasure of His will, hath chosen in Christ, unto everlasting glory, out of His mere free

grace and love, without any foresight of faith or good works, or perseverance in either of them, or any other thing in the creature, as conditions or causes moving Him thereunto; and all to the praise of His glorious grace.

VI. As God has appointed the elect unto glory, so hath He, by the eternal and most free purpose of His will foreordained all the means thereunto. Wherefore they who are elected, being fallen in Adam, are redeemed by Christ, are effectually called unto faith in Christ by His spirit working in due season; are justified, adopted, sanctified and kept by His power through faith unto salvation. Neither are any others redeemed by Christ, effectually called, adopted, justified, sanctified and saved, but the elect only.

VII. The rest of mankind, God was pleased, according to the unsearchable counsel of His own will, whereby He extendeth or withholdeth mercy as He pleaseth, for the glory of His sovereign power over His creatures, to pass by, and to ordain them to dishonor and wrath for their sin, to the praise of His glorious justice.''

In 1903 the Presbyterian Church in the United States of America revised its confession of faith by adding thereto the following declaratory statement:

''While the ordination vow of ministers, ruling elders, and deacons as set forth in the form of government, requires the reception and adoption of the confession of faith only as containing the system of doctrine taught in the Holy Scriptures, nevertheless, seeing that the desire has been formally expressed for a disavowal by the church of certain inferences drawn from statements in the confession of faith, and also for a declaration of certain aspects of revealed truth, which appear at the present time to call for more explicit statement, therefore, the Presbyterian Church in the United States of America does authoritatively declare as follows:

(1) With reference to Chapter III of the confession of faith: That concerning those who are saved in Christ, the doctrine of God's eternal decree is held in harmony with the doctrine of His love to all mankind. His gift of His son to be the propitiation for the sins of the whole world, and His readiness to bestow His saving grace on all those who seek it. That concerning those who perish, the doctrine of God's eternal decree is held in

harmony with the doctrine that God desires not the death of any sinner, but has provided in Christ a salvation sufficient for all, adapted to all, and freely offered in the gospel to all; that men are fully responsible for their treatment of God's gracious offer; that His decree hinders no man from accepting that offer, and that no man is condemned except on the grounds of his sin.

(2) With reference to Chapter X, §3, of the confession of faith: That it is not to be regarded as teaching that any who die in infancy are lost. We believe that all dying in infancy are included in the election of grace, and are regenerated and saved by Christ through the spirit, who works when and where and how He pleases.''

The following declarations, among others, were also added:

''I. God, in infinite and perfect love, having provided in the covenant of grace, through the mediation and sacrifice of the Lord Jesus Christ, a way of life and salvation, sufficient for and adapted to the whole lost race of man, doth freely offer this salvation to all men in the gospel.

II. In the gospel God declares His love for the world, and His desire that all men should be saved reveals fully and clearly the only way of salvation; promises eternal life to all who truly repent and believe in Christ; invites and commands all to embrace the offered mercy; and by His spirit accompanying the word pleads with men to accept His gracious invitation.

III. It is the duty and privilege of every one who hears the gospel immediately to accept its merciful provisions; and they who continue in impenitence and unbelief incur aggravated guilt, and perish by their own fault.''

In the latter part of the eighteenth century, and the beginning of the nineteenth century, a part of the territory now comprising middle Tennessee and Kentucky was called the Cumberland country. In the beginning of the nineteenth century there developed in this Cumberland country an extraordinary religious awakening, which was afterwards known as the revival of 1800. This revival was originated and promoted largely through the Christian activity of a large number of ministers and laymen of the Presbyterian Church, who

were afterwards known as the "Revival party." The revival movement, and especially its methods, were opposed by some of the most conservative Presbyterian ministers and laymen of the Cumberland country. They soon became known as the "Anti-Revival party." There were not enough ministers in that section of the country efficiently to carry on the revival work, and the emergency did not allow time to educate new ministers according to the Presbyterian standard of education. Devout laymen, in some instances, undertook, under these peculiar circumstances, to explain and enforce the teachings of the gospel, and, their efforts proving successful, the Cumberland presbytery of the Presbyterian Church ordained them to the full work of the ministry. The Presbyterian synod appointed a commission, and cited all these preachers and public exhorters to appear before it and answer to the charge of not adopting the confession of faith in its entirety, and to submit to an examination in "the learned languages." Upon deliberation, the commission formally prohibited all the men, whom the Cumberland presbytery had licensed and ordained, "from preaching the gospel in the name of Presbyterians." Whereupon an agreement was made and signed by Samuel McAdow, Finis Ewing and Samuel King, creating the Cumberland Presbyterian Church.

These young men in their evangelistic work naturally made prominent and emphatic the free agency of the individual in accepting the plan of salvation. In this way their attention was an especial challenge to the teachings of the Westminster confession of faith as to the doctrines of election, foreordination, the eternal decrees, and the correlated doctrines.

The Cumberland presbytery, in 1810, issued a circular letter giving at length the reasons for the organization of the new denomination. The document is direct and simple in statement. It was the utterance of sincere men, determined to worship God according to the dictates of their own consciences.

In May, 1906, there were in the Cumberland Presbyterian Church, 17 synods, 114 presbyteries, 1,514 ordained ministers, 9,641 ordained elders, 3,914 ordained deacons, 2,869 congregations, and a membership of 185,212. The property of one of these congregations is involved in this litigation. The Cumberland Presbyterian Church made a brief statement in 1813, setting forth the points in which it dissented from the Westminster confession of faith. It was as follows:

"(1)    That there are no eternal reprobates.

(2)    That Christ died not for a part only, but for all mankind.

(3)    That all infants dying in infancy are saved through Christ and the sanctification of the Spirit.

(4)   That the spirit of God operates on the world, or as coextensive as Christ has made atonement, in such a manner as to leave all men inexcusable."

In 1885 a revision of its constitution was made, in part, as follows:

## "DECREES OF GOD.

(8)    God, for the manifestation of His glory and goodness, by the most wise and holy counsel of His own will, freely and unchangeably ordained or determined what He himself would do, what He would require His intelligent creatures to do, and what should be the awards, respectively, of the obedient and the disobedient.

(9)    Though all divine decrees may not be revealed to men, yet it is certain that God has decreed nothing contrary to His revealed will or written word."

## "FREE WILL.

(34)    God, in creating man in His own likeness, endued him with intelligence, sensibility and will, which form the basis of moral character, and render men capable of moral government.

(35)    The freedom of the will is a fact of human consciousness, and is the sole ground of human accountability. Man, in his state of innocence, was both free and able to keep the divine law, also to violate it. Without any constraint, from either physical or moral causes, he did violate it."

## "REGENERATION.

(54)   All infants dying in infancy, and all persons who have never had the faculty of reason, are regenerated and saved."

## "PRESERVATION OF BELIEVERS.

(60)   Those whom God has justified, He will also glorify; consequently, the truly regenerated soul will not totally fall away from a state of grace, but will be preserved to everlasting life."

## "CHRISTIAN LIBERTY.

(71)   The liberty that Christ has secured to believers under the gospel consists in freedom from the guilt and penal consequences of sin, in their free access to God, and in their yielding obedience to Him, not from a slavish fear, but from a cheerful and confiding love.

(72)   God, who alone is Lord of the conscience, has left it free, in matters of faith and worship, from such opinions and commandments of men as may be contrary to His word.

(73)   Those who, upon pretense of Christian liberty, practice any sin, or cherish any lust, do thereby destroy the end of Christian liberty, which is, that, being delivered from the dominion of sin, we may serve the Lord without fear in righteousness all our days."

The form of government of the two churches seems to be substantially the same.   That of the Cumberland church is set out in the constitution of 1883:

"(2)   The universal church consists of all those persons, in every nation, who make profession of the holy religion of Christ and of submission to His laws. As this immense multitude cannot meet together in one place to hold communion or to worship God, it is proper, and authorized by scripture example, that they should be divided into many particular churches."

## "PARTICULAR CHURCH.

(4)   A particular church consists of professing Christians, voluntarily associated together for divine worship and Godly living, agreeably to the holy scriptures, and submitting to a certain form of government. Its officers are the minister in charge, the ruling elders

and the deacons. Its jurisdiction is lodged in the church session, composed of the minister in charge and the ruling elders.''

## ''CHURCH OFFICERS.

(8)     The ordinary and perpetual officers of the church are teaching elders or ministers of the word, who are commissioned to preach the gospel and administer the sacraments, ruling elders, the representatives of the people, and deacons.''

## ''CHURCH COURTS.

(24)     It is necessary that the government of the church be exercised under some certain and definite form, and by various courts, in regular gradation. These courts are denominated 'church sessions,' 'presbyteries,' 'synods' and the 'general assembly.' ''

## ''GENERAL ASSEMBLY.

(40)     The general assembly is the highest court of this church, and represents in one body all the particular churches thereof. It bears the title of the general assembly of the Cumberland Presbyterian Church, and constitutes the bond of union, peace, correspondence and mutual confidence among all its churches and courts.''

'' (43)     The general assembly shall have power to receive and decide all appeals, references and complaints regularly brought before it from the inferior courts; to bear testimony against error in doctrine and immorality in practice, injuriously affecting the church; to decide in all controversies respecting doctrine and discipline; to give its advice and instruction, in conformity with the government of the church, in all cases submitted to it; to review the records of the synods; to take care that the inferior courts observe the government of the church; to redress whatever they may have done contrary to order; to concert measures for promoting the prosperity and enlargement of the church; to create, divide or dissolve synods; to institute and superintend the agencies necessary to the general work of the church; to appoint ministers to such labors as fall under its jurisdiction; to suppress schismatical contentions and disputations, according to the rules provided therefor; to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrine and order of this church; to authorize synods and pres-

byteries to exercise similar power in receiving bodies suited to become constituents of those courts, and lying within their geographical bounds respectively; to superintend the affairs of the whole church; to correspond with other churches; and, in general, to recommend measures for the promotion of charity, truth, and holiness throughout all the churches under its care.''

## "AMENDMENTS.

(60) Upon the recommendation of the general assembly, at a stated meeting, by a two-thirds vote of the members thereof voting thereon, the confession of faith, catechism, constitution and rules of discipline, may be amended or changed when a majority of the presbyteries, upon the same being transmitted for their action, shall approve thereof.''

After the revision of its creed by the Presbyterian Church in the United States of America in 1903, the general assembly of that church and the general assembly of the Cumberland Presbyterian Church each appointed a committee to confer on the subject of union. Each committee made a report, recommending a union of the two churches upon a basis set forth, the substance of which was: (1) That they unite under the name of the Presbyterian Church in the United States of America, and possess all the rights and powers of the separate churches; (2) that the union be effected on the doctrinal basis of the confession of faith of the Presbyterian Church in the United States of America, as revised in 1903; (3) that each of the general assemblies submit the basis of union to its presbyteries, which shall be required to meet before April 30, 1905, and answer the question: "Do you approve," etc.? and to forward to the stated clerk of the assembly with which they are connected their vote on said basis of union; that the vote of presbyteries be submitted to the respective stated clerks of the general assembly of 1905, and if the general assemblies find that the basis of union has been approved by a constitutional majority of the presbyteries connected with each church, then the same shall be of binding force, and both assemblies shall take action accord-

ingly. The report of the combined committee, recommending submission of the proposition, was received by the general assembly of the Cumberland Presbyterian Church, and a motion to recommend and submit the plan of union was carried.

At the 1905 meeting of the general assembly, the stated clerk presented two reports of the special committee on organic union. The majority report was in favor of union. It shows that of 114 presbyteries, 111 voted on the question, 60 for and 51 against union, and submitted a resolution to the effect that union has been constitutionally agreed to, and the basis therefor constitutionally adopted. The minority report shows that 60 presbyteries voted for union and 51 against it, and that the summary of said vote shows that 691 ministers and 649 elders voted for union, making a total of 1,340; also that 470 ministers and 1,007 elders voted against approval, making a total of 1,477, and declaring that the basis for union has not been constitutionally adopted. It was also asserted that the plan of union was not unconditionally adopted by the Presbyterian Church in the United States of America, but only "if the way be clear," and that the joint report providing for separate presbyteries "for a particular race" has not been met by a proviso for such separate presbyteries "if desired" by a particular race. A motion to adopt the minority report was lost 111 to 135, and a motion to adopt the majority report was carried 135 to 110. A protest by 91 commissioners was filed. The committee on organic union was enlarged, and directed to confer with the union committee of the Presbyterian Church in the United States of America, and arrange the details of the union. A joint report of such committee was submitted to the assemblies of the respective churches in 1906, and adopted by a vote of 165 to 91. Record was made of the fact that 12 members, who were absent when the vote was taken, would have voted with the minority. A protest signed by 100 commissioners against the adoption of such report was presented,

and after other action, which does not seem to be material, a motion to adjourn *sine die* was carried. The majority, before adjournment, were informed, on the floor of the assembly, that the minority would treat adjournment as illegal, and would continue the session of the general assembly thereafter. They thereupon selected a temporary chairman, and proceeded to complete an organization as the general assembly of the Cumberland Presbyterian Church, and are maintaining their organization, claiming to be the general assembly of the Cumberland Presbyterian Church.

It is stipulated, in effect, that the appellants are duly elected as trustees of the Washington congregation, and refuse to acquiesce in the action of the general assembly in the matter hereinbefore specified, while appellants, also formally selected, recognize such action as valid.

In the consideration of a controversy arising from religious differences and involving so many persons, it is important that the point of view from which the case is 1. to be considered be clearly sensed and not forgotten.

The attitude of the government is stated in both the federal and state Constitutions. It needs to be not only kept in mind, but emphasized. The 1st amendment to the federal Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Article 1, §§2-6, of the state Constitution are as follows: "2. All men shall be secured in their natural right to worship Almighty God according to the dictates of their own consciences. 3. No law shall, in any case whatever, control the free exercise and enjoyment of religious opinions or interfere with the rights of conscience. 4. No preference shall be given, by law, to any creed, religious society, or mode of worship; and no man shall be compelled to attend, erect, or support any place of worship, or to maintain any ministry, against his consent. 5. No religious test shall be required as a qualification for any office of trust or profit. 6. No money shall be drawn from the

treasury for the benefit of any religious or theological institution.'' So long as the spirit of these provisions is preserved, the people of this country are protected from the horrors of religious persecution and from the bloodshed of theological war.

The principles which rule the case at bar are strictly analogous to those which prevail in controversies between the officers and members of a mutual benefit association.

2.  *Supreme Lodge, etc.,* v. *Knight* (1889), 117 Ind. 489, 497, 3 L. R. A. 409; *Hatfield* v. *DeLong* (1901), 156 Ind. 207, 51 L. R. A. 751, 83 Am. St. 194; *Watson* v. *Jones* (1871), 13 Wall. 679, 20 L. Ed. 666. ''Religious organizations come before us in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law, and the actions of their members subject to its restraints.'' *Watson* v. *Jones, supra.* Protestants, Catholics and Jews are equally protected by the provisions quoted, and while the case at bar has to do with the interests of a great Protestant denomination, the decision may not be in any degree moulded by the personal affiliations or ideas of the judges who render it.

The Presbyterian church consists of the members. Where there are no members there can be no church. The officers of a particular church are the minister in charge, the

3.  ruling elders and the deacons. The government is administered by various courts in regular gradation, beginning with the church session and ending with the general assembly. The manner of selection and the power of each of these governing bodies are specifically prescribed. Each individual congregation is bound to the presbytery over it by the fact that before it can become a Presbyterian congregation it must be received by the presbytery, and can neither obtain a minister or contract with him without the consent of the presbytery, nor can it dissolve such relation without such consent. If a congregation should refuse to obey these

rules, it would be in a state of rebellion against lawfully constituted authority, and could be properly excluded from the body of the church. If, in such case, a minority of the congregation should be willing to submit to the authority of the presbytery, it would be recognized by the civil authorities as the true congregation, and would have the right to hold and use the church property. This is the substance of the decision in the leading case of *Watson* v. *Jones, supra.* The vital connection between each individual congregation

4. and the presbytery, originating when the congregation is received into the presbytery, is continued active and effective through the agency of the church session which sends its delegates to, and thereby participates in the creation and conduct of, the presbytery. The church session, so far as it is composed of elders, is created by the voice of the people who compose the congregation, and, as said in the case of *Landrith* v. *Hudgins* (1907), (Tenn.), 120 S. W. 783, "that organization is one of associated churches, all linked together by a chain of constituent organizations, each joined to a presbytery, and each presbytery, and all the presbyteries, joined to the general assembly, the common bond of union between all the churches and church courts. Each individual church (congregation) is, as it were, a link in a section of chain; this section of chain is welded, as it were, into the larger link—the presbytery; and all the presbyteries linked together forming a larger chain—the general assembly; so that every link, even to the smallest, is connected with every other link." It might have been provided that a direct vote of the members of each congregation should be taken upon questions of general concern, as in the United Brethren Church (*Lamb* v. *Cain* [1891], 129 Ind. 486, 14 L. R. A. 518), but the method in fact provided, while more circuitous and indirect, is the established method by which the congregations are given opportunity to express themselves. The session may send a delegate to the presbytery to represent the view of the congregation. This tends to make

the vote of that presbytery an expression of the consensus of judgment of the various congregations composing it, and therefore a proposition of a general nature, affecting the whole church, which receives the approval of a majority of the presbyteries, must be held and taken as approved by a majority of the church. It was said in the case of *Landrith* v. *Hudgins, supra:* "It is presumed that the elders representing the congregations, and the pastors or ministers, know the wishes of the majority, and truly speak the voice of that majority—in other words, that they truly represent the wishes of the congregations. Such is the course that must be pursued on any general question that can be lawfully submitted to all of the congregations." The question of union with another denomination can be submitted only in this way. The general question upon which the judgment of the congregations, and therefore of the members of the church, is desired, must be proposed by the general assembly, since there is no other central authority.

It is essential at this point to determine what this constitution is and the manner of its interpretation and construction. The supreme court of Kentucky has held that 5. the church judicatories are the repositories of all the ecclesiastical powers of the church, except as limited by the express provisions of the constitution. *Wallace* v. *Hughes* (1909), (Ky.), 115 S. W. 684.

The supreme court of Texas holds "that each court must find in the constitution some express authority given for the performance of any act by it." *Brown* v. *Clark* (1909), (Tex.), 116 S. W. 360.

The supreme court of Georgia said in the case of *Mack* v. *Kime* (1907), 129 Ga. 1, 58 S. E. 184: "The authority of the general assembly of the Cumberland Presbyterian Church is derived from the constitution. This church, in its form of government, is like its predecessor. The form of government is not unlike the federal form of government under which we live. The general assembly of the church is the

highest legislative, executive and judicial power of the church. It has, in these three capacities, all the authority that is expressly conferred by the constitution, as well as that which is necessarily implied from any of the express powers therein granted or from the general design and purpose for which the organization was formed.''

These courts, considering in the cases cited the same questions presented in this case, each held with the Presbyterian Church in the United States of America, but the agreement between them seems to be largely restricted to the result.

''A constitution of a voluntary association or a corporation is nothing more than a by-law under an inappropriate name. * * * The provisions of the established by-laws of an association such as that with which the assured united are * * * elements of the contract of insurance. They are factors which cannot be disregarded. That they have this effect, all who become members of the association must know. A person who enters an association must acquaint himself with its laws, for they contribute to the admeasurement of his rights, his duties and his liabilities. * * * It is not one by-law, or some by-laws of which the member must take notice, for he must take notice of all which affect his rights or interest. * * * Where, as here, there is an express and clear reservation of the right to amend he is bound to take notice of the existence and effect of that reserved power.'' *Supreme Lodge, etc.,* v. *Knight, supra.* And see *Pfister* v. *Gerwig* (1890), 122 Ind. 567, 571. There is in these cases an element which does not exist in a purely religious society; but, following the analogy, it must be held that the authority of the governing bodies is limited and defined by the constitution of the church, and that the provisions thereof are a part of the compact by which the church and the church members are united. *Bear* v. *Heasley* (1893), 98 Mich. 279, 57 N. W. 270, 24 L. R. A. 615, 621.

What such governing bodies are thereby authorized to do, including matters of necessary implication, they may do, and

each possesses those inherent powers which are necessary to the fulfilment of its respective functions. What is not thus authorized may not be done by the governing bodies. The constitution expressly provides for amendment, when, in the judgment of the church, obtained in the manner provided, change or addition is demanded. That the Cumberland Presbyterian Church had power to abandon its or-

6. ganization, and to incorporate its membership into the Presbyterian Church in the United States of America, is undoubted. The object of the existence of Christian churches is the same. Denominational differences are not intended to be unending. A union with another organization may be regarded by the church as a step in consummation of the common purpose. The same considerations hold good with regard to beneficial societies. The accomplishment of benevolence is a common object, and a union of two societies, engaged in promoting such object, is unquestionably within the discretion of the societies, subject, of course, to legislative restrictions upon the power of incorporated companies in that behalf. But it by no means follows that the board of directors, trustees or church courts have inherent power to merge the society which they represent into another one. The inherent power to do that is in the members of the church, the society, the lodge, and nowhere else.

That the courts of the Cumberland Presbyterian church were not designed to be the possessors of inherent power to do such acts, is shown by section twenty-five of the re-

7. vision of the constitution, which is, in part, as follows: "And the jurisdiction of these courts is limited by the express provisions of the constitution." There is a reason in the history of the Cumberland Presbyterian Church for the provision quoted. The founders of that church had been severely dealt with by the general assembly of the Presbyterian Church in the United States of America in 1804-9. It was natural for the church founded by them specifically to declare that the courts of their church had only such pow-

ers as are expressly conferred upon them, and that they intended to do this, seems reasonably clear from the language quoted. To deny such purpose, upon the ground that to express it the word "to" should have been used instead of the word "by," is a mere quibble.

The constitution provides that the general assembly shall have power "to concert measures for promoting the prosperity and enlargement of the church. To receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrine and order of this church." This language does not admit of any construction except that the integrity of the temporal organization of the church is to be preserved and its legal and ecclesiastical existence continued and enlarged. Authority to merge or abandon the organization is not conferred. This was evidently the understanding of the general assembly as to its own power. Having

8. appointed a committee to confer with the other organization as to the subject of church union, it submitted the question to the membership through the machinery provided for that purpose, and if the church itself, acting in regular form, having complete power over its creed, name and organization, had decided to unite with the other church, such action would have been regularly taken.

The joint report of the committee advised: (1) That the two churches be united under the name of the Presbyterian Church in the United States of America, which preserved intact its creed, name and organization, while the Cumberland Presbyterian Church surrendered its name, creed and organization, and was absorbed by the first-named church. (2) That such union be effected on the doctrinal basis of the confession of faith of the Presbyterian Church in the United States of America, as revised in 1903, and of its other doctrinal and ecclesiastical standards. The question addressed to the presbyteries called for a categorical answer, and was as follows:

"Do you approve of the reunion and union of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church on the following basis: The union shall be effected on the doctrinal basis of the confession of faith of the Presbyterian Church in the United States of America, as revised in 1903, and of its other doctrinal and ecclesiastical standards; and the scriptures of the old and new testaments shall be acknowledged as the inspired work of God, the only infallible rule of faith and practice?"

The use of the word "reunion" does not change the legal effect of the proposition. The Cumberland Presbyterian Church and the Presbyterian Church in the United States of America had never, as churches, been united. The Cumberland organization was created by persons who had been members of the Presbyterian Church in the United States of America, and had departed from it. In one sense the combination of these churches would be a reunion, but in the same sense the merger of the Presbyterian church into the Catholic church would also be a reunion, and it is scarcely necessary to say that, from a legal point, the question is one of the union of two independent churches.

The first subdivision of the plan which involved a surrender of the name and organization of the Cumberland Presbyterian Church was not submitted to the presbyteries, but was determined by the general assembly of the Cumberland Presbyterian Church. The question did not arise in the Presbyterian Church in the United States of America, because under the plan of union that church was to retain both its name and organization. The general assembly had, as we have seen, no authority in itself to merge the Cumberland Presbyterian Church. The vote of the presbyteries was in favor of union upon the basis indicated. If what was thereafter done was necessarily incidental to union, it must be regarded as authorized by the vote. If it was not necessary thereto, then it must be regarded as the action of the general assembly with regard to a matter not within its authority. The

theory that the action taken amounted to an amendment of the constitution, and conferred such authority, has evidently been deduced since the constitutionality of the action of the general assembly has been questioned. No amendment was recommended. This is, by the terms of section sixty of the constitution, the first step. None was voted upon and none was made. The conduct of governing bodies must conform to the constitution, and constitutions are not changed by their failure so to conform. The plan of union provided for the merger of the Cumberland Presbyterian Church into the Presbyterian Church in the United States of America. To merge is to "swallow up." March's Thesaurus Dict. Merger is "the absorption of a thing of lesser importance by a greater, whereby the lesser ceases to exist but the greater is not increased." Bouvier's Law Dict. A consolidation takes place when both companies are extinguished and a new one created, taking over the holdings of those passing out of existence. *Adams* v. *Yazoo, etc., R. Co.* (1899), 77 Miss. 194, 24 South. 200, 317, 28 South. 956, 60 L. R. A. 33; *McMahan* v. *Morrison* (1861), 16 Ind. 172, 79 Am. Dec. 418; *Clearwater* v. *Meredith* (1863), 1 Wall. 25, 17 L. Ed. 605; *St. Louis, etc., R. Co.* v. *Berry* (1884), 113 U. S. 465, 5 Sup. Ct. 529, 28 L. Ed. 1055; Clarke & Marshall, Priv. Corp., p. 1042. A consolidation is also defined as a union of two or more corporations, which necessarily results in a new one. *Adams* v. *Yazoo, etc., R. Co., supra; State, ex rel.,* v. *Montana R. Co.* (1898), 21 Mont. 221, 53 Pac. 623, 45 L. R. A. 271; *Miles Lamp Chimney Co.* v. *Erie Fire Ins. Co.* (1905), 164 Ind. 181; *Town of Longview* v. *City of Crawfordsville* (1905), 164 Ind. 117, 68 L. R. A. 622; *McMahan* v. *Morrison, supra.*

Merger and consolidation are equally productive of union, and union might have been had without either merger or consolidation. Union means agreement, concord, harmony. The Union—the league of States—does not involve the destruction of any of them. The word used

is most general, and could mean many different things, so that the vote for union was not necessarily a vote for the merger of the Cumberland Presbyterian Church—for the surrender of its organization or the extinguishment of its name.    Under the Presbyterian system, the members of the church have no direct voice in the matter, but it must be determined by the presbyteries for them, and it was extremely important that there should have been a full and fair submission of the whole matter to the presbyteries.    Had this been made, it might easily be that the proposition would have been defeated, or, being carried, that litigation and controversy would not have arisen from it.

There are here two churches claiming the property of the Cumberland Presbyterian Church; one of them by that name and one as the successor of that church under the name of the Presbyterian Church in the United States of America, and "the central question in this case is this:    Which of these organizations is the church?"    *Lamb v. Cain* (1891), 129 Ind. 486, 508, 14 L. R. A. 518.    "No principle is better settled than that property conveyed to trustees for the use of a church by its denominational name, as was the case here, creates a trust for the promulgation of the tenets and doctrines of that denomination."    *Smith v. Pedigo* (1896), 145 Ind. 361, 416, 19 L. R. A. 433.    See, also, *Mt. Zion Baptist Church v. Whitmore* (1891), 83 Iowa 138, 49 N. W. 81, 13 L. R. A. 198;    *Park v. Chaplin* (1895), 96 Iowa 55, 64 N. W. 674, 59 Am. St. 353, 31 L. R. A. 141; *Lamb v. Cain, supra.*    The property being held in trust for the purpose named, the title to it is in that part of a divided congregation which is acting in harmony with its laws, usages, custom and principles.    *Smith v. Pedigo, supra; White Lick Quarterly Meeting, etc.,* v. *White Lick Quarterly Meeting, etc.* (1883), 89 Ind. 136; *Yanthis v. Kemp* (1907), 40 Ind. App. 649; *Park v. Chaplin, supra.*

Those sections of the Westminster creed heretofore quoted are clear and concise.    They enunciate the doctrine of pre-

destination.  The founders of the Cumberland Pres-
13.  byterian Church were expelled for the reason that they
were not in accord with the doctrine.  The brief state-
ment of the new church, made in 1813, was equally clear.
The conflict between those doctrines is both manifest and his-
torical, and admits of no denial.  Harmony between the two
churches can be had only by a renunciation of the Westmin-
ster doctrine, or a surrender of the distinctive idea of the
Cumberland church.  Such surrender would, however, re-
sult in leaving those who refuse to join in it in possession of
the property held in trust for the advancement of the faith
held by the early Cumberland Presbyterian Church.  It is
claimed that the approach has been made by the other party.
So far from the Presbyterian Church in the United States
of America having renounced any part of the Westminster
creed, it is apparent from the record that such creed is still
held in its entirety.  The preamble of the declaratory state-
ment of 1903 recites that a desire has been formally expressed
for the disavowal of certain inferences, and for a declaration
of certain aspects of revealed truth which appear at the pres-
ent time to call for more explicit statement.  That the West-
minster confession is adhered to in its entirety by the Pres-
byterian Church in the United States of America is emphat-
ically declared by it.  A resolution of its general assembly in
1904 is as follows:

"Resolved (4) that the assembly, in connection
with this whole subject of union with the Cumberland
Presbyterian Church, places on record its judgment
that the revision of the confession of faith, effected in
1903, has not impaired the integrity of the system of
doctrine contained in the confession and taught in the
Holy Scriptures, but was designed to remove misappre-
hensions as to the proper interpretation thereof."

In 1906, in an answer to an address from the Cumberland
general assembly, it said:

"We had not heard, until your communication an-
nounced it, that anybody had claimed or induced others

to believe that the Presbyterian Church in the United States of America had abandoned the Westminster confession of faith. This is not true."

This is a candid expression of fact. It is more than probable that such serious and clear minded men as composed the general assembly of the Presbyterian Church in the United States of America, had they intended to change the creed, would have done so in direct and unambiguous phrase, withdrawing those expressions to which further assent was refused. Additions which may leave room for disputation as to the present meaning, and declarations regarding inferences to be drawn from language which does not admit of doubt as to its meaning, are not equivalent thereto.

This much has been said on the assumption that questions discussed have not been foreclosed by the action of the general assembly of the Cumberland Presbyterian Church. All those decisions, in which the validity of the attempted union has been sustained, rest in some manner upon the rule which is well stated in the case of *Watson* v. *Jones* (1871), 13 Wall. 679, 20 L. Ed. 666, as follows: "In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority, is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." See, also, *Lamb* v. *Cain, supra; Gaff* v. *Greer* (1882), 88 Ind. 122, 45 Am. Rep. 449; *White Lick Quarterly Meeting, etc.,* v. *White Lick Quarterly Meeting, etc., supra; Dwenger* v. *Geary* (1888), 113 Ind. 106; *Hatfield* v. *DeLong* (1903), 31 Ind. App. 210; *Hatfield* v. *DeLong* (1901), 156 Ind. 207, 51 L. R. A. 751, 83 Am. St. 194; *Smith* v. *Pedigo* (1896), 145 Ind. 361, 19 L. R.

A. 433; *Fuchs* v. *Meisel* (1894), 102 Mich. 357, 60 N. W. 773, 32 L. R. A. 92; *Bear* v. *Heasley* (1893), 98 Mich. 279, 57 N. W. 270, 24 L. R. A. 615; *Schlichter* v. *Keiter* (1893), 156 Pa. St. 119, 27 Atl. 45, 22 L. R. A. 161.

Church cases involving the right of property held by religious societies are classified in the case of *Watson* v. *Jones* (1871), 13 Wall. 679, 20 L. Ed. 666, and such classification has been generally adopted. "(1) The first of these is when the property which is the subject of controversy has been, by the deed or will of the donor, or other instrument by which the property is held, by the express terms of the instrument devoted to the teaching, support or spread of some specific form of religious doctrine or belief. (2) The second is when the property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority. (3) The third is where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization."

Where a controversy arises in a church of the congregational style, and "it is alleged  *  *  *  that property thus dedicated is being diverted from the use intended by the donor, by teaching a doctrine different from that contemplated at the time the donation was made, however delicate and difficult it may be, it is the duty of the court to inquire whether the party accused of violating the trust is teaching a doctrine so far at variance with that intended as to defeat the objects of the trust, and if the charge is found true, to make such orders in the premises as will secure a faithful execution of the trust confided, *Watson* v. *Jones* [1871], 13

Wall. 679, 20 L. Ed. 666; *Miller* v. *Gable* [1845], 2 Denio 492; *Attorney-General, ex rel.,* v. *Pearson* [1817], 3 Mer. 353; *Watkins* v. *Wilcox* [1876], 66 N. Y. 654; *Attorney-General, ex rel.,* v. *Town of Dublin* [1859], 38 N. H. 459; *Happy* v. *Morton* [1864], 33 Ill. 398; *Fadness* v. *Braunborg* [1889], 73 Wis. 257, 41 N. W. 84."

In the case of *Lamb* v. *Cain* (1891), 129 Ind. 486, 510, 14 L. R. A. 518, it is said: "If such trust is confided to a religious denomination or congregation it is not in the power of a majority of that denomination or congregation, however large the majority may be, by reason of a change of religious views, to carry the property thus dedicated to the support of a new and different doctrine."

In the case of *Park* v. *Chaplin* (1895), 96 Iowa 55, 64 N. W. 674, 59 Am. St. 353, 31 L. R. A. 141, it was held that the majority of the members of a Free-Will Baptist society could not, as against the will of a minority, transfer property to the Baptist church, which had been obtained for the use and benefit of the first-named denomination; that a provision in the manual of church government of the Free-Will Baptist Church, that a church in good standing might have a letter of dismissal and recommendation to another evangelical denomination, referred to the church as an ecclesiastical body, rather than as a purely legal body.

In the case of *Smith* v. *Pedigo* (1896), 145 Ind. 361, 19 L. R. A. 433, which was a controversy involving a church of the congregational style, it was asserted that the action of the majority was conclusive upon the civil courts. Regarding this claim the court said: "The main contention of the appellees is that they represent the majority of the members of the church that belonged thereto at the time that the division took place, and that the acts, rules and orders adopted by them in the regular course of church business are the acts of Mount Tabor Regular Baptist Church, and therefore binding on all members, both majority and minority, whether those acts were in accord with the laws, usages, practice, faith

and belief upon which the church was originally founded or not. In other words, their contention substantially amounted to this: That the acts of the majority, done in the regular course of church business, is the law of the church, no matter how great the departure from the original faith and law upon which the church is founded. While the appellants contend that the acts of the majority, though done in the regular course of church business, but in violation of the laws, usages, faith and principles upon which the church was founded, and over the protest and objection of the minority, are not binding on anybody and are not the acts of the church. * * * If the majority cannot admit one who does not believe or acquiesce in the articles of faith, then it would be equally true that the majority have no power to change the faith of the church against the objection or protest of the minority. As well might it be contended that a banking corporation or association, by a majority vote of its stockholders or directors, could change its business from banking to insurance business, or into that of a railroad company against the protest of the minority, and *vice versa*. * * * The contention amounts to this: The church becoming divided into two factions on account of a difference in religious belief and faith, the majority being accused by a minority of departing from the original faith, they sit in judgment in their own case, pass solemn judgment in their favor that they, being a majority, and hence the church, had a right to change the faith, and hence are not guilty of the charge. * * * The only thing that can rescue this claim from the charge of unmitigated assumption pure and simple, is the contention that a majority faction of a church divided into two conflicting bodies on account of differences as to the standard of faith is the real and true church. That contention, we have seen, has no foundation in law or authority. To permit such majority, under such groundless assumption, to exclude or excommunicate the minority, who still adhere to the original faith, and

claim to be the church so as to affect property rights, would be a reproach to the law. It would be the law making the title to the property turn upon a mere trick."

In the case just quoted from, great weight was given to the finding of a religious body without authority to which the contending factions had voluntarily submitted their dispute, and, upon a consideration of all the facts, the doctrine in issue was upheld by the court. While the case at bar involves church property held by a denomination which has a complete and carefully prepared system of judicature, it does not come within the principle enunciated by the third subdivision before quoted. If the controversy was based upon a division originating between the members of different factions of the Washington church, it would come within the doctrine of such subdivision, and the civil courts would be constrained to adopt the conclusions reached by presbytery, synod or assembly, to which the issue had been in due form of ecclesiastical law submitted. This controversy, however, arises from and is based upon a schism which has taken place, not primarily in the Washington church, but in the general assembly of the Cumberland Presbyterian Church itself. To give to the action of the majority of such general assembly authority to foreclose the question would be to make such majority the sole judge of its own controversy, and subject to the exact criticism applicable to the claim that the majority of a congregational church can decide for itself, and preclude investigation by the civil courts when the right of property is involved. *Fuchs* v. *Meisel* (1894), 102 Mich. 357, 60 N. W. 773, 32 L. R. A. 92; *Bear* v. *Heasley* (1893), 98 Mich. 279, 57 N. W. 270, 24 L. R. A. 615.

"Where a schism occurs in an ecclesiastical organization which leads to a separation into distinct and conflicting bodies, the respective claims of such bodies to the use of the property belonging to the organization must be determined by the principles which underlie the

control of voluntary associations. If there be within the organization officers or duly appointed persons in whom the powers of such control are vested, those who adhere to the acknowledged organism by which the organization is governed are entitled to the use of the property, without reference as to whether they constitute a majority of members. The title to the property of a divided church is in that part of the organization which is acting in harmony with its own law; and the ecclesiastical laws, usages, customs, principles and practices, which were accepted and adopted by the church before the division took place, constitute the standard for determining which of the contesting parties is in the right.'' *White Lick Quarterly Meeting, etc.,* v. *White Lick Quarterly Meeting, etc.* (1883), 89 Ind. 136. See, also, *Gaff* v. *Greer* (1882), 88 Ind. 122, 45 Am. Rep. 449; *Krecker* v. *Shirey* (1894), 163 Pa. St. 534, 30 Atl. 440, 29 L. R. A. 476. If there were a tribunal provided to which the schism in the general assembly of the Cumberland Presbyterian Church could in due form of law be submitted and determined, no further inquiry would be here made; but there is no such tribunal provided, and where ''property rights are involved the secular courts will, as a rule, decide the merits of the case for themselves.'' *Hatfield* v. *DeLong* (1901), 156 Ind. 207, 51 L. R. A. 751, 83 Am. St. 194. Of course, so far as merely ecclesiastical questions are concerned, where rights of property are not involved, the civil courts do not take jurisdiction. *Hatfield* v. *DeLong* (1901), 156 Ind. 207, 51 L. R. A. 751, 83 Am. St. 194; *Hatfield* v. *DeLong* (1903), 31 Ind. App. 210; *Yanthis* v. *Kemp, supra.* The question as to which faction of the Cumberland general assembly, and of the church which following its lead divides into factions, represents the true doctrine of the Cumberland Presbyterian Church is therefore to be decided by the civil courts. *Landrith* v. *Hudgins* (1909), (Tenn.), 120 S. W. 783. The authorities in this State are in accord upon this question. In *Lamb* v. *Cain,*

*supra,* the question for decision was as to the adoption of a proposed amendment to the confession of faith and of the constitution of the church of the United Brethren in Christ. The Supreme Court carefully reviewed the facts relative to such amendment, and held it to have been legally adopted. In doing this, weight was given to the finding of the circuit court that the amended creed was not antagonistic to the principles of the original one.    The distinction between those cases in which the schism takes place in the highest tribunal of the organization and those in which it arises in subsidiary departments was not made, and for that reason the court said such rules "need not be examined here."

Even if the finding of the Cumberland general assembly were conceded the force of a conclusive adjudication, it does not embrace all of the necessary matters here involved.

20.    The general assembly has not declared the respective doctrines of the two denominations to be either identical or substantially identical.    The concurrent declaration upon the subject is as follows:

"In adopting the confession of faith of the Presbyterian Church in the United States of America, as revised in 1903, as a basis of union, it is mutually recognized that such agreement now exists between the systems of doctrine contained in the confessions of faith of the two churches as to warrant this union—a union honoring alike to both."

That an essential difference does exist appears from a resolution adopted by the Presbyterian general assembly in May, 1906, in part, as follows:

"That ministers, ruling elders and deacons, in expressing approval of the Westminster confession of faith, as revised in 1903, are required to assent only to the system of doctrine contained therein; and not to every particular statement in it."

Those members of the Cumberland Presbyterian Church who insist that the property of that organization is being diverted are not precluded by the conclusion that "such

agreement'' exists as to warrant the union, nor can the identity of doctrine necessary to a legal union be created by a resolution formally excusing those of one church from belief in part of the articles of the creed of the church into which they are incorporated. They have a right to insist upon a confession of faith of which they can say in deep sincerity ''I believe.''

Language used by the supreme court of Iowa in *Park* v. *Chaplin* (1895), 96 Iowa 55, 64 N. W. 674, 59 Am. St. 353, 31 L. R. A. 141, is especially apt here: ''It is not any part of our duty to decide whether the difference between the respective articles of faith, covenants and practice of the two denominations is substantial. It may be true that changes in such matters are constantly going on, and that it is beyond human power to prevent them; that in those things which make for worldly prosperity, as popularity, wealth and numbers, the defendant church would be greatly benefited by the union with the Baptist denomination as proposed; but considerations of that kind have nothing to do with the legal rights of the parties to this action, and cannot be given weight in determining the questions of which we have jurisdiction. It is enough for the purposes of this case that the two denominations are now separate and distinct; that the property in controversy was acquired by the defendant church for the special benefit of one of them; and that the plaintiffs, being members of that church and of that denomination, object to the proposed change and insist that it shall not be made.''

The judgment is reversed and the cause remanded, with instructions to sustain appellants' motion for a new trial.

## ON PETITION FOR REHEARING.

ROBY, P. J.—Appellees' argument is interwoven with erroneous assumptions, and proceeds upon apparent misapprehension. This is a mere lawsuit over the ownership of real estate. The right of the appellees' church to believe as it chooses and to worship as it wishes is in no single, remote manner involved. It claims to own certain houses. It claims such ownership on the ground that the Cumberland Presbyterian Church, which built and owned them, has become a part of the Presbyterian Church in the United States of America. Appellants deny this, and say they are not united or merged; that the proceedings to that end were ineffective; that unity of doctrine was necessary, and that such unity did not exist. Appellees claim that the question was solely for the general assembly of the Cumberland Presbyterian Church, and that it found that such agreement now exists between the systems of doctrine contained in the confession of faith of the two churches as to warrant this union. This comes short of a finding of the unanimity necessary. The following is a part of the report submitted by the committee from the Cumberland Presbyterian Church:

"But brethren dwell together in unity, not by identity of beliefs, nor by the acceptance of absolutely unobjectionable doctrinal symbols, but by mutual tolerance, forbearance and love."

The committee from the Presbyterian Church in the United States of America reported, in part, as follows:

"The revision of the confession of faith had effected no material change in the doctrinal attitude of our church."

See *Boyles* v. *Roberts* (1909), 222 Mo. 613, 121 S. W. 805. Therefore to counsel's inquiry, "Shall this honorable court deny to this great church the right to interpret its own doctrine?" the answer must be that what the court has denied, is the right of this great church to compel the appellants to

accept its interpretation against their beliefs, except that such interpretation shall have been so made, in strict accordance with form, as to become conclusive upon them. The question is not what this great church believes, but what it may compel others to believe, on the compulsion of surrendering property rights. So free indeed is this church to place its own interpretation upon the doctrines taught by the Master, that were it to renounce litigation as a means of grace no one would have power to say nay. But claiming title in court it must do as other litigants, and submit each link in its chain to the test.

The statement of the opinion quoted from *Smith* v. *Pedigo* (1896), 145 Ind. 361, 19 L. R. A. 433, 32 L. R. A. 838, to the effect that property conveyed to a church by a denominational name is held in trust for the promulgation of the doctrines and tenets of that denomination, is the subject of much criticism. It is true that such trust is not specific, but general for the uses of the congregation, but unless it does exist the appellee church would be without standing, since it claims to hold, as the successor of the Cumberland Presbyterian Church, property held by it for such use.

The disposition of this litigation really turns upon the accuracy of the statement heretofore made, to the effect that the schism which has arisen took place in the general assembly, and that such fact incapacitated that tribunal from rendering a conclusive adjudication upon the subject-matter thereof. If this is not true, then the majority vote in the general assembly ended the matter. If it is true, there is no doubt in this court of the correctness of the conclusion heretofore announced. Is there a schism in the Cumberland Presbyterian Church? A schism is defined as the splitting up of a church. Has there been a splitting up of the Cumberland Presbyterian Church? The record and briefs herein are eloquent of the fact. When and where did the schism first take tangible form?

When one part of the general assembly of 1906 declared that church by that name to be a thing of the past, while the other part of that assembly, carrying out a previously-announced purpose, "met at the Grand Army hall" and completed the organization of the general assembly which claimed and still claims to speak for the Cumberland Presbyterian Church, if this was not a schism, and if it did not take place in the general assembly it would be interesting to know what it was and where it took place. But appellees' counsel ask if we would deny full credit to the judgment of a court of a sister state because there was a majority and minority opinion? It might be better to ask whether an ordinance of secession, adopted by a majority vote, could foreclose a loyal minority when the record was produced in a sister state? Neither illustration is well chosen. The Cumberland Presbyterian Church in Indiana is subject to the law of Indiana. "The duly chosen and authorized representatives of the members are alone vested with power to determine when a change is demanded, and with their discretion courts will not interfere. * * * Courts will compel adherence to the charter and to the purpose for which the society was organized but they will do no more." *Supreme Lodge, etc.,* v. *Knight* (1889), 117 Ind. 489, 497, 3 L. R. A. 409. When it appeared that fraud was practiced to procure a church judgment, fair on its face, the court interposed. *Hatfield* v. *DeLong* (1901), 156 Ind. 207, 51 L. R. A. 751, 83 Am. St. 194. Here is a general assembly divided, each part claiming to represent the church. The court is compelled to ascertain which body does, in fact, represent the church; which is adhering to the purpose for which the society was organized. When that fact is settled, the action of the lawful body will be accorded controlling place. This is exactly the situation which has so frequently arisen in this State when the quarrel was between the members of a church of the congregational form of government. Appellees contend that the majority in the general assembly of 1906 foreclosed

all inquiry. This was exactly the question discussed in *Smith* v. *Pedigo, supra.* It is not a question of majorities; it is a question of power. Appellees would concede that a majority could not, over the objection of a minority, have merged the Cumberland Presbyterian Church with the Christian Scientists. It is said in the opinion that the Presbyterian Church in the United States of America consists of its members. This statement was incorrect. It is for the church to say of what it consists, and, adopting the views expressed by counsel, it is now held, modifying the opinion, that the church consists of members and officers, and that its governmental power comes, not from the people, but from the Divine Founder of the Christian religion, which power is vested in church officers, organized into church courts, acting in accordance with a written constitution.

The counsel say: ''The tendency in the Christian church is confessedly toward unification, and this unification is regarded as the wise and Christian cause which should obtain through Christendom. Have the courts no duty to assist in the great work?'' There has been sounded throughout the case a tone not unfamiliar in history. Unification has been the tendency, as counsel say. Philip of Spain sought it, and the courts of his time had a duty laid upon them. The judgments of the inquisition were formed to ''assist in the great work.'' Haughty priest and zealous ruler, bearing fagot and sword, have ridden fast and far. On yonder curling thread of white smoke the soul of Servetus went to God. The courts do have a duty to perform, and so long as that duty is regarded the most humble dweller in the hills may worship in his own way, in his own house, according to the dictates of his own conscience, secure and unafraid.

Petition overruled.